[Crim. No. 6310. In Bank. Mar. 11, 1959.]

THE PEOPLE, Respondent, v. NICHOLAS GORSHEN, Appellant.

718

Garry, Dreyfus, McTernan & Keller, Benjamin Dreyfus and Charles R. Garry for Appellant.

George G. Olshausen as Amicus Curiae on behalf of Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant pleaded not guilty to a charge of murder. Trial by jury was waived (as authorized by Cal. Const., art. I, § 7) and the court (see Pen. Code, § 1167) found defendant guilty of second degree murder. Defendant appeals from the ensuing judgment. He urges that uncontradicted psychiatric testimony, accepted by the trial court, establishes that defendant did not intend to take human life

or, at least, that he did not act with malice aforethought, and that therefore he should be acquitted or, as a minimum of relief, that the offense should be reduced to manslaughter. We have concluded: (1) that the evidence as to the objective circumstances of the killing supports all findings essentially implied by the judgment; (2) that the record does not support defendant's position that the trial court believed the evidence that defendant did not have the state of mind which was required as an element of second degree murder yet found defendant guilty of that crime; and (3) that, accordingly, the judgment should be affirmed.

Defendant, a longshoreman, shot and killed his foreman, Joseph O'Leary, at about 2:30 a.m. on March 9, 1957. The record discloses the following events leading up to the homicide: At 5 p.m. on March 8 defendant reported to the dispatching hall. Between 6 and 7 o'clock he and a fellow worker ate and consumed a fifth of a gallon of sloe gin. Defendant worked until 11 p.m. Between 11 and 12 o'clock defendant and the fellow worker ate and consumed a pint of sloe gin. Shortly after 12 midnight O'Leary saw defendant standing on the deck of the ship drinking a glass of coffee. O'Leary told defendant to go to work. Defendant threw the glass to the deck, exchanged "a few words" with O'Leary, and went to work. Thereafter O'Leary told defendant that he was drunk and was not doing his work properly and directed defendant to go home. They argued, defendant spat in O'Leary's face, and O'Leary knocked defendant down and kicked him. At the request of other workers O'Leary walked away from defendant. Defendant threw a piece of dunnage and brandished a carton at O'Leary.

Paul Baker, a "walking boss," took defendant to a hospital. Defendant was bleeding and bruised; his left eye was swollen shut and a deep cut under it required five or six stitches. Defendant was discharged at 1:45 a.m. The hospital records bear the notation, "Alcoholic Breath." As Baker drove defendant back to the pier where they worked, defendant said "that he was going to go home and get a gun and kill this fellow."

When he reached the pier defendant said that he wished to return to work but his superiors insisted that he go home. Defendant said, "I'll go home and get my gun. I'll come back and take care of him." Defendant drove to his home, got a .25 caliber automatic pistol which contained two bullets, fired one shot in his living room, put the gun in his apron, and

drove back to the pier. He arrived there about 30 minutes after he had been sent home and went onto the ship looking for O'Leary.

O'Leary and Nelson, a union business agent, had followed defendant to his house and, when they saw defendant leave his house, had driven to a police station. Police officers went to the pier. They searched defendant but did not find his gun. Defendant told the officers that he "had a fight with Mr. O'Leary, and . . . that he couldn't forget about the eye that he had obtained during the fight." One of the officers described defendant as "angry," "almost tearsome," "emotional," but not incoherent or boisterous.

O'Leary and Nelson then appeared. Defendant said, "My buddy. Hah, my buddy," and produced the gun. O'Leary shouted, "Look out, he's got the gun." Defendant shot. The single bullet entered O'Leary's abdomen, killing him; it also wounded Nelson's arm.[1] The officers subdued defendant after a brief struggle. Defendant told the authorities, shortly after the homicide, that O'Leary was "looking at me, smiling, so I just let him have it. .... Nelson was standing by; I had to take chance to hit him, because I had only one bullet."

Defendant had a very good reputation for peace and quiet and did not usually drink to excess. He testified as follows: During the 15 years he had known O'Leary prior to the night of the homicide they had been friends and had had no trouble. Defendant's recollection of the events of that night was "kind of hazy." He considered it unfair of O'Leary to order him to go home but to retain the fellow worker with whom defendant had been drinking. "The argument starts about he wants me to go home and I . . . tell him that I intend to wait until business agent comes in, so apparently he, he hit me and knocked me off, off the floor and when I jumped up, he got on and hit me again, and that's—then I tried to defend myself. I, I didn't hit him . . .; he was apparently too fast for me or stronger, bigger." Defendant did not recall throwing a piece of dunnage or brandishing a carton or threatening to go home and get a gun. When he discharged the gun in his home, "I didn't know it was on the safety or not, I was shaky, I didn't know what I was doing." Defendant recalled little of his return to the pier, but did recall that the police searched him. Then he saw O'Leary "grinning, looking at

---

[1] The trial court found defendant not guilty of a charge of assault with a deadly weapon with intent to murder Nelson.

me. I don't know what, what become of me. I just grabbed the gun and shot.''

Dr. Bernard L. Diamond, a psychiatrist who examined defendant, testified as follows:[2]

After described examinations and tests of defendant, the doctor concluded that defendant suffers from chronic paranoiac schizophrenia, a disintegration of mind and personality. For 20 years defendant has had trances during which he hears voices and experiences visions, particularly of devils in disguise committing abnormal sexual acts, sometimes upon defendant. Defendant recognizes that these experiences are ''not real'' but believes that they are forced upon him by the devil. Apparently defendant, prior to his examination by Dr. Diamond, had not disclosed these experiences to anyone.

A year before the shooting defendant (who was 56 years of age at the time of trial) became concerned about loss of sexual power. With this concern his sexual hallucinations occurred with increased frequency and his ability in his work became increasingly important to him as a proof of manhood.

On the night of the shooting, O'Leary's statement that defendant was drunk and should leave his work was to defendant the psychological equivalent of the statement that ''You're not a man, you're impotent, . . . you're a sexual pervert.'' Then, according to defendant's statements to Dr. Diamond, O'Leary applied to defendant an epithet which indicated sexual perversion. At this point, according to Dr. Diamond's opinion, defendant was confronted with ''the imminent possibility of complete loss of his sanity. . . . [A]s an alternate to total disintegration . . ., it's possible for . . . an individual of this kind, to develop an obsessive murderous rage, an unappeasable anger. . . . The strength of this obsession is proportioned not to the reality danger but to the danger of the insanity . . . [F]or this man to go insane, means to be permanently in the world of these visions and under the influence of the devil. . . . [A]n individual in this state of crisis will do anything to avoid the threatened insanity, and it's this element which lends strength to his compulsive behavior so that he could think of nothing else but to get O'Leary, so he went home and got the gun and shot him; and [as] is usually the case in this type of event, the shooting itself released the danger of [defendant's complete mental disintegration].''

---

[2] It should be noted that no question of legal insanity is here involved.

Defendant told Dr. Diamond that from the time he was taken to the emergency hospital until the time of the shooting "That is all I was thinking about all of this time is to shoot O'Leary. I forgot about my family, I forgot about God's laws and human's laws and everything else. The only thing was to get that guy, get that guy, get that guy, like a hammer in the head."

In the opinion of the doctor, defendant acted almost as an automaton; "even the fact that policemen were right at his elbow and there was no possibility of getting away with this, still it couldn't stop the train of obsessive thoughts which resulted in the killing . . . [H]e did not have the mental state which is required for malice aforethought or premeditation or anything which implies intention, deliberation or premeditation."

Dr. Diamond quoted section 188 of the Penal Code, which provides that the "malice aforethought" which is an essential element of murder "may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." He then gave his opinion of the "medical essence" of "malice aforethought"; i.e., "whether an individual performs an act as a result of his own free will or intentionality, or . . . whether the action is directly attributable to some abnormal compulsion or force, or symptom or diseased process from within the individual."[3]

The doctor further explained that in his opinion "actions, like the threat to kill, the going home to get the gun and so forth"—actions which "in an ordinary individual" would be evidence "that he intended to do what he did do, and that this was an act of free will and deliberation"—in defendant's case were, rather, "just as much symptoms of his mental illness as the visions and these trances that he goes into."

In cross-examining Dr. Diamond, the prosecuting attorney quoted the following statements from an article by the doctor

[3]The trial court correctly overruled the People's objection that by this testimony the doctor gave "a medical interpretation of a legal principle." The court did not permit the doctor to usurp the judicial function of interpreting legislative language; rather, it properly permitted him to explain what he meant by his opinion that defendant lacked malice aforethought. (See *People* v. *Woods* (1937), 19 Cal.App.2d 556, 561-562 [65 P.2d 940]; *People* v. *Martinez* (1952), 38 Cal.2d 556, 562-563 [241 P.2d 224].)

entitled *"With Malice Aforethought"* (Archives of Criminal Psychodynamics (1957), vol. 2, No. 1) :[4]

"Freud, in 1904, brilliantly demonstrated by analysis of slips of the tongue, forgetting, and trains of association that what we call free will or voluntary choice is merely the conscious rationalization of a chain of unconsciously determined processes. Each act of will, each choice presumedly made on a random basis, turns out to be as rigidly determined as any other physiological process of the human body. Yet all of us continue to live our lives, make our choices, exercise our free will, and obey or disobey the law as if we actually had something to say about what we are doing. . . . It does no good to proclaim to the jurist that scientific evidence proves that there is no such thing as free will. . . ."

The prosecuting attorney then asked, "you feel there is no such thing as free will?" The doctor replied, "I believe in what the philosophers call the posit of free will. A posit is a working assumption. When I treat a patient, if I believed as

---

[4]The trial court considered the entire article, not merely the portions which the prosecuting attorney read aloud. The doctor's position can be better understood when the statements excerpted by the prosecuting attorney are read in their context, which is as follows:

"[T]he central issue [in a psychiatric evaluation of malice aforethought], that of the age-old philosophical abstraction of free will vs. determinism, is itself undetermined. Freud, in 1904, brilliantly demonstrated by analysis of slips of the tongue, forgetting, and trains of association that what we call free will or voluntary choice is merely the conscious rationalization of a chain of unconsciously determined processes. Each act of will, each choice presumedly made on a random basis, turns out to be as rigidly determined as any other physiological process of the human body. Yet all of us continue to live our lives, make our choices, exercise our free will, and obey or disobey the law as if we actually had something to say about what we are doing. Criminal law could not exist were it not for this posit that each normal person intends to do the act which he does do and that such intention is based upon the exercise of free will.

"Medical psychology has embarrassingly few answers to this one question which the criminal law is most interested in. It does no good to proclaim to the jurist that scientific evidence proves that there is no such thing as free will. There is a subjective phenomenon which the normal individual experiences as free will. Illusory or not, free will remains the basis of all criminal law simply because free will is the basis of all normal social behavior.

"In truth, today, *we do not have a sufficient foundation of scientific knowledge about the ego functions of decision, choice, and determination of action to justify the formulation of any general principles which could be applied to the law. . . .*

"*The task then becomes to understand the motivations, intent, and actions of the individual who deviates from the common-sense posit of free will. This can be accomplished without specious generalizations which would attack the very structure of the law itself and would compel nonacceptance by the juridical mind. . . .*" (Italics added.)

a working assumption, that everything is predetermined or determined by forces outside of the patient's choice and consciousness, there would be no point in my doing psychotherapy or psychoanalysis; because obviously nobody would ever get better. I certainly proceed on the theory that I and our patients have something to say about what I do and about our choices. What I cannot tell you, because there is no scientific proof, is how much. . . . I know that individuals who are suffering from certain kinds of mental illnesses, tend to have very little to say about many of the things that happen to them; other people have a great deal to say about it. . . . Now, whether or not it could be scientifically demonstrated that in no instance is there any free will, this is something I can't give you any answer to.''

The trial court stated at some length the matters which it considered in reaching its decision. It said, ''up till the time that Dr. Diamond testified in this case, there was no explanation of why this crime was committed. . . . [The doctor is] the first person that has any reasonable explanation. Whether it's correct or not, I don't know . . . [I]f I would follow Diamond's testimony in toto, I should acquit this man. . . .

''I'm willing to go on the record, that in all probability his theories are correct . . . that he had no particular intent to commit this crime.

''I like to be advanced. But it seems to me that my hands are tied with the legal jurisprudence as it stands today, and that's why I'm saying this for the purposes of the record. The Appellate Court might say that my hands are not tied, but I think they are. . . . [E]ven accepting in part the testimony of Dr. Diamond, I still feel that this man is guilty of second degree murder.''

In reply to defense counsel's assertion that ''There is not one scintilla of malice,'' the court said, ''it all depends on how you view it. . . . Some other person or another Judge, might say, 'Malice, why, it's full of it. He planned it. He said he was going to do it, he went home, he had an hour.' ''

Again defense counsel asked, ''Does your Honor feel that there is malice here?'' The court replied, ''there was some intent. Now, whether you have free will or not free will, that's so advanced, we're not prepared for that . . . There's plenty, plenty of malice as far as statements are concerned, and plenty of malice as far as actions are concerned. Now, whether he was compelled to do this because of some mental condition, that is so advanced and so far from us that we don't under-

stand it. . . . [I]t would be a perfect first degree if it wasn't for the fact that he's never been in trouble and because of the statement of the Psychiatrist.''

██ Dr. Diamond's testimony was properly received in accord with the holding of *People* v. *Wells* (1949), 33 Cal.2d 330, 346-357 [202 P.2d 53], that on the trial of the issues raised by a plea of not guilty to a charge of a crime which requires proof of a specific mental state, competent evidence that because of mental abnormality not amounting to legal insanity[5] defendant did not possess the essential specific mental state is admissible. ██ The admission of testimony such as that of the expert here, for the purpose of consideration by the trier of fact upon issues of particular essential mental state, does not, as it has been suggested, imply acceptance (on the general issue) of the defense of irresistible impulse (which is rejected in this state as a test of the defense of legal insanity; see 25 Cal.Jur.2d, Homicide, § 254; 14 Cal. Jur.2d, Criminal Law, § 218) nor does it imply rejection of the criminal law's postulate of free will. It has been said (in *People* v. *Hoin* (1882), 62 Cal. 120, 123 [45 Am.Rep. 651]) that ''Whatever may be the abstract truth, the law has never recognized an impulse as uncontrollable which yet leaves the reasoning powers—including the capacity to appreciate the nature and quality of the particular act—unaffected

---

[5]I.e., insanity measured by the familiar test restated in M'Naughton's Case (1843), 10 Clark & Fin. 200, 8 Eng. Rep. 718, and long accepted in this state (*People* v. *Coffman* (1864), 24 Cal. 230, 235; *People* v. *Wells*, *supra*, pp. 350, 351 [20] of 33 Cal.2d): that at the time defendant committed the act, he was laboring under such a defect of reason, from disease of the mind, that he did not know the nature and quality of his act or, if he did know it, that he did not know that he was doing what was wrong.

We have recently had occasion to say that, if this test is to be changed, arguments for such change should be addressed to the Legislature rather than the court. (*People* v. *Berry* (1955), 44 Cal.2d 426, 433 [3] [282 P.2d 861]; *People* v. *Daugherty* (1953), 40 Cal.2d 876, 894 [256 P.2d 911].) The conclusion that the courts should not initiate a new definition or test of the insanity which absolves legal responsibility for any crime is supported by the circumstance that the Legislature, when it enacted the rather unusual procedure for determination of the issue of such insanity at a stage of the proceedings separate from the proceedings at which the other issues are tried (Stats. 1927, ch. 677, Pen. Code, §§ 1016, 1017, 1020, 1026) did not suggest any change in the McNaghten test. (*Cole* v. *Rush* (1955), 45 Cal.2d 345, 355 [8-9] [289 P.2d 450, 54 A.L.R.2d 1137] [the Legislature is presumed to have known of domestic judicial decisions and to have enacted and amended statutes in the light of such decisions as have a direct bearing on them; failure of the Legislature to change the law in a particular respect when the subject is before it and changes in other respects are made indicates an intent to leave the law as it stands in the aspects not amended].)

by mental disease." (See also *People* v. *Stein* (1918), 23 Cal. App. 108, 115-116 [137 P. 271].) But this statement must be considered in its context; it was made in the course of an opinion which holds that irresistible impulse does not constitute the insanity which is a complete defense; i.e., which is exculpatory of all penal responsibility for any otherwise criminal act. So considered, statements such as that quoted from the Hoin case do not preclude the admission and consideration, on the issue of specific intent or other particular mental state, of expert testimony which includes such concepts as the uncontrollable compulsion described by the expert here (described, it may be added, not as an "abstract truth" but as arising upon the specific facts, objective and subjective, of this particular killing).

 Such expert evidence, like evidence of unconsciousness resulting from voluntary intoxication, is received not as a "complete defense" negating capacity to commit any crime but as a "partial defense" negating specific mental state essential to a particular crime. In *People* v. *Baker* (1954), 42 Cal.2d 550, 575 [17] [268 P.2d 705], this court pointed out that "Unconsciousness is a complete, not a partial, defense to a criminal charge (Pen. Code, § 26, subd. 5),[6] and, although voluntary intoxication may at times amount to unconsciousness, yet it can only have the effect of negating specific intent, the applicable code section being section 22[7] and not 26, subdivision 5." *People* v. *Sanchez* (1950), 35 Cal.2d 522, 531 [6] [219 P.2d 9], recognizes that the voluntary intoxication relied on as a partial defense to negate *specific intent* may in fact be sufficient to *destroy volition*. And *People* v. *Harris* (1866), 29 Cal. 678, 681-684 (described by the code commissioners as "a correct and authoritative exposition of [Pen. Code] Sec. 20; [8] see, also, Sec. 22," in their note at the time (1872) when the Legislature codified the rules

---

[6]Pen. Code, § 26, subd. 5: "All persons are capable of committing crimes except those belonging to the following classes: . . . Five. Persons who committed the act charged without being conscious thereof."

[7]Pen. Code, § 22: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

[8]Pen. Code, § 20: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence."

which still appear in sections 20, 22, and 26, subdivision 5) explains a situation in which, although it is expressly recognized that voluntary intoxication is not an excuse for crime, such intoxication could result in acquittal. Harris was convicted of voting more than once at an election. He was intoxicated when he voted. In reversing his conviction because of error in the instructions, the court says, "The theory upon which it was sought to exculpate the defendant of criminality was that he was in such a condition, mentally, when he voted the second time, as not to know that he had already voted . . . [I]t is a universal doctrine that to constitute what the law deems a crime there must concur both an evil act and an evil intent. . . . Therefore the intent with which the unlawful act was done must be proved . . . Now, when the statute declares the act of voting more than once at the same election by the same person to be a felony, it must be understood as implying that the interdicted act must be done with a criminal intention, or under circumstances from which such intention may be inferred. . . . While the condition of the accused, caused by drunkenness, may be taken into consideration by the jury with the other facts of the case, to enable them to decide in respect to the question of intent, it is proper to observe that [voluntary] drunkenness will not excuse crime. (*People* v. *King*, 27 Cal. 514.) The inquiry to be made is whether the crime which the defendant is accused of having committed *has in point of fact been committed*, and for this purpose whatever will fairly and legitimately lead to the discovery of the mental condition and status of the accused at the time, may be given in evidence to the jury, and may be considered by them in determining whether the defendant was in fact guilty of the crime charged against him."

It should be noted that there are certain other peculiarities, arising out of statutory language, in connection with the meaning and proof of the mental states requisite to criminal homicide. With reference to the general intent referred to in section 20 of the Penal Code (quoted *ante*, footnote 8), section 21 says, "The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots nor lunatics, nor affected with insanity." ▆ Section 21 is of little aid in appraising either general or specific intent. A person may *objectively* manifest discretion ("Power of free decision"; Webster's New Inter-

nat. Dict. (2d ed., 1958)) and a sound mind, yet be without intent because, e.g., he is unconscious. ■ And the second sentence of section 21 is not very enlightening. In this state there appears to be no statutory or judicial definition or test of idiocy or lunacy as related to criminal state of mind.[9] Nor are the dictionary definitions helpful.[10] ■ More enlightening is the judicial recognition (in *People* v. *Baker* (1954), *supra*, 42 Cal.2d 550, 568, 569 [9, 11, 12]) that " 'Sound mind' and 'legal sanity' are not synonymous. . . . 'Soundness' of mind is defined as 'free from flaw, defect or decay, perfect of the kind; undamaged or unimpaired; healthy, not diseased or injured, robust—said of body or mind.' (Webster's New Internat. Dict., p. 2403.) . . . If the defendant has a 'sound mind,' that is, 'a healthy and robust mind, neither diseased nor injured,' it necessarily follows that he would not have a mental infirmity making him incapable of premeditating or deliberating. . . . ■ Although moronity and the mental condition caused by epileptic seizures, unless they amount to unconsciousness, are not included within the exempting provisions of section 26 of the Penal Code [lack of criminal capacity], nevertheless these conditions may indicate some lack of a 'healthy and robust mind' and do have bearing on the question of the capacity to premeditate and deliberate.''

Section 7 of the Penal Code provides that ''The following words have in this code the signification attached to them in this section, unless otherwise apparent from the context: 1. The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or

---

[9]It has been said that ''Imbecility is no defense against crime unless its existence deprives the individual of the power to distinguish between right and wrong.'' (*People* v. *Keyes* (1918), 178 Cal. 794, 801 [175 P. 6].)

[10]An idiot is one afflicted with idiocy, and idiocy is ''Extreme deficiency in intelligence, commonly due to incomplete or abnormal development of the brain. The deficiency is usually congenital or due to arrest of development following disease or injury in early childhood.'' A lunatic generally is ''A person affected with lunacy; an insane person, orig. one who had lucid intervals; a madman; a person of unsound mind'' and, in relation to law, ''A person whose abnormal mental condition renders him incapable or irresponsible before the law.'' Lunacy is ''a. Orig., a kind of insanity interrupted by lucid intervals, formerly supposed to be influenced by the changes of the moon. b. Later, any form of insanity. c. Now, chiefly in legal usage, insanity amounting to lack of capacity or of responsibility in the eyes of the law.'' (Webster's New Internat. Dict. (2d ed., 1958).)

to injure another, or to acquire any advantage . . . 4. The words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law . . ." ▮ The context of the word "willful" in the statutory definition of the here pertinent kind of first degree murder ("willful, deliberate, and premeditated killing"; Pen. Code, § 189) shows that the requisite intent here is not merely, e.g., to commit the act of discharging a gun, but includes the intent to kill a human being as the objective or result of such act.

As used in relation to the "malice aforethought" essential to murder, section 188 of the Penal Code declares that "Such malice [see definition of murder in Pen. Code, § 187] may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."[11] ▮ The context of the word "malice" in the statutes specifically relating to homicide shows that the word there means "something more than the word imports as defined in section 7." (*People* v. *Waysman* (1905), 1 Cal.App. 246, 248 [81 P. 1087]; *People* v. *Chavez* (1951), 37 Cal.2d 656, 666 [3] [234 P.2d 632] [sec-

---

[11]We need not now undertake the task of formulating an inclusive or comprehensive definition of the malice aforethought which distinguishes murder from manslaughter. The difficulty of such task has been often pointed out. (See *People* v. *Holt* (1944), 25 Cal.2d 59, 83, 85 [153 P.2d 21]; *People* v. *Miceli* (1951), 101 Cal.App.2d 643, 650 [226 P.2d 14]; Pike, *What is Second Degree Murder in California* (1936), 9 So.Cal.L.Rev. 112; Perkins, *A Reexamination of Malice Aforethought* (1934), 43 Yale L. Jour. 537.) It has been said that "Malice aforethought is a term ordinarily used in connection with the felonious killing which is murder to designate it from manslaughter. The words do not imply deliberation or the lapse of considerable time between the malicious intent to take life and its actual execution, but rather denote *purpose* and *design* in contradistinction to accident and mischance. (See Bouvier's Law Dictionary, vol. 2, p. 2068.)" (*People* v. *McNabb* (1935), 3 Cal.2d 441, 456 [8] [45 P.2d 334]; *People* v. *Wells* (1949), *supra*, 33 Cal.2d 330, 338 [5].) But this is not a sufficiently complete definition or test, for (a) voluntary and some kinds of involuntary manslaughter may in fact be committed with purpose and design, yet the law removes malice aforethought from all forms of manslaughter (see *People* v. *Bender* (1945), 27 Cal.2d 164, 181 [14] [163 P.2d 8]; *People* v. *Holt* (1944), *supra*, 25 Cal.2d 59, 85); (b) "Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence," have no capacity to commit crime (Pen. Code, § 26, subd. 6) and homicide "committed by accident and misfortune" is, in the circumstances described in section 195 of the Penal Code, "excusable."

tion 7 definition of malice should not be read to the jury in a murder case].)

Section 1962 of the Code of Civil Procedure declares that "A malicious and guilty intent" is conclusively presumed "from the deliberate commission of an unlawful act, for the purpose of injuring another." This "conclusive presumption" has little meaning, either as a rule of substantive law or as a rule of evidence, for the facts of deliberation and purpose which must be established to bring the presumption into operation are just as subjective as the presumed fact of malicious and guilty intent.

A further problem arises as to whether evidence of defendant's abnormal mental or physical condition (whether caused by intoxication, by trauma, or by disease, but not amounting to legal insanity or unconsciousness) can be considered to rebut malice aforethought and intent to kill in a case such as the one at bar, where the prosecution evidence shows infliction of a mortal wound for the purpose of killing and the evidence does not show provocation which would meet the law's definition of voluntary manslaughter, an unlawful killing upon a sudden quarrel or in a heat of passion such as would naturally be aroused in the mind of an *ordinary reasonable person* under the circumstances (*People* v. *Valentine* (1946), 28 Cal.2d 121, 137 [14], 139 [169 P.2d 1]). In such a case the question whether the intent to kill was formed as the result of deliberation and premeditation can be answered by evidence that the particular defendant, because of impairment of his mental ability by intoxication, injury, or disease, could not and therefore did not deliberate, as well as by evidence of objective circumstances, but the question whether defendant was guilty of murder or manslaughter is traditionally answered on the basis of the objective (reasonable man) standard of the provocation which, by rule of law, removes malice aforethought (even though it may in fact exist) from manslaughter. (See Weihofen and Overholser, *Mental Disorder Affecting the Degree of a Crime* (1947), 56 Yale L. Jour. 959, 969.) So it has been held that voluntary intoxication, although it can be considered on the question of the degree of murder, cannot be considered on the question whether defendant is guilty of murder or manslaughter. (*People* v. *Keyes* (1918), *supra*, 178 Cal. 794, 797; *People* v. *Methever* (1901), 132 Cal. 326, 332 [64 P. 481]; *People* v. *Vincent* (1892), 95 Cal. 425, 428 [30 P. 581]; *People*

v. *Jones* (1883), 63 Cal. 168, 169; *People* v. *De La Cour Soto* (1883), 63 Cal. 165; *People* v. *Langton* (1885), 67 Cal. 427, 428 [7 P. 843]; *People* v. *Ferris* (1880), 55 Cal. 588, 592; *People* v. *Williams* (1872), 43 Cal. 344, 345-346, 352; *People* v. *Lewis* (1869), 36 Cal. 531, 532; *People* v. *Nichol* (1867), 34 Cal. 211, 215-216, 217; *People* v. *Belencia* (1863), 21 Cal. 544, 547; *People* v. *Hopper* (1919), 42 Cal.App. 499, 503 [5] [183 P. 836]; see also *People* v. *Miller* (1896), 114 Cal. 10, 13 [45 P. 986] [which incorrectly states that evidence of intoxication was ''valueless'' on the issue of the degree of murder because other evidence showed that the crime was deliberate and premeditated].)

 These last cited cases appear mistaken in view of the following rules: Section 22 of the Penal Code says that ''whenever the actual existence of *any particular purpose, motive, or intent* is a necessary element to constitute any particular *species* or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.'' (Italics added.) The section refers to any ''species'' (kind) of crime as well as to any ''degree'' of crime. The state of mind known as ''malice aforethought'' comes within the meaning of the phrase ''any particular purpose, motive, or intent.'' (See *People* v. *Baker* (1954), *supra,* 42 Cal.2d 550, 568, 571 [referring, in regard to murder, to ''the intent involved in the elements of malice aforethought, premeditation, and deliberation,'' ''the 'intent' necessary to constitute malice aforethought'']; *People* v. *Wells* (1949), *supra,* 33 Cal.2d 330, 343 [9] [referring to ''the specific intent or motive amounting to malice aforethought'' in the crime of violating Pen. Code, § 4500, which provides that certain kinds of assault committed by life-term prisoners ''with malice aforethought'' are capital offenses].) ''Malice aforethought'' is a ''necessary [statutorily prescribed] element'' of both degrees of murder (''Murder is the unlawful killing of a human being, with malice aforethought''; Pen. Code, § 187). Specific intent to kill is not a ''necessary [statutorily prescribed] element'' of second degree murder but is a necessary element of the kind of first degree murder which we are here considering (a ''willful, deliberate, and premeditated killing''; Pen. Code, § 189) and is implicit in the statutory description of the kind of manslaughter which we are here discussing (''the

unlawful killing of a human being . . .Voluntary"; Pen. Code, § 192).

It would seem elementary that a plea of not guilty to a charge of murder puts in issue the existence of the particular mental states which are essential elements of the two degrees of murder and of manslaughter (a crime traditionally regarded as necessarily included in murder although in some cases the mental element of manslaughter may be more accurately described as differing from, rather than included in, the mental element of murder). Accordingly, it appears only fair and reasonable that defendant should be allowed to show that in fact, subjectively, he did not possess the mental state or states in issue.

Some cases have recognized the propriety of considering evidence of subjective mental condition for this purpose. Thus, *People* v. *Selph* (1930), 106 Cal.App. 704, 707 [289 P. 918], in discussing the effect of evidence of voluntary intoxication in a homicide case, says that "while the insanity of the defendant is not in issue under the general plea, yet this does not preclude the introduction of evidence tending to establish the mental condition of the accused [12] at the time the offense was committed for the purpose of showing a lack of criminal intent, malice or premeditation."

In *People* v. *Chesser* (1947), 29 Cal.2d 815, 824 [178 P.2d 761, 170 A.L.R. 246] (where there was a little evidence of premeditation and no evidence of provocation), this court recognizes that defendant "may have been so deeply under the influence of intoxicating liquor that he was incapable of forming in his mind that malice aforethought which is an essential element of the crime of murder in either degree." Also, in the following cases of apparently intended unlawful killings where there was no evidence of provocation sufficient to arouse the passion of the ordinarily reasonable man, the court mentions without disapproval instructions which would permit the jury to find manslaughter because of evidence of intoxication: *People* v. *Tuthill* (1947), 31 Cal.2d 92, 103 [187 P.2d 16]; *People* v. *Burkhart* (1931), 211 Cal. 726, 733 [7] [297 P. 11]; *People* v. *Yeager* (1924), 194 Cal. 452, 474 [8] [229 P. 40]. (See also *People* v. *Gomez* (1953), 41 Cal.2d 150, 164-165 [15] [258 P.2d 825], where there was evidence of mental abnormality; *cf. People* v. *Danielly* (1949), 33 Cal.2d 362,

---

[12]This must be understood to mean mental condition other than legal sanity or insanity. (*People* v. *Wells* (1949), *supra,* 33 Cal.2d 330, 350 [14b].)

376-379 [1-5] [202 P.2d 18], where the rejected evidence of nervous instability was not shown to be relevant to defendant's possession of malice aforethought, the evidence adduced by the defense presenting only the alternatives that defendant did not kill the deceased or that if he did kill her he acted while unconscious.) We conclude that the Selph (1930) case, *supra*, page 707 of 106 Cal.App. (opinion authored for the District Court of Appeal by the late Justice Ira F. Thompson, who thereafter became a justice of this court), rather than the cases (Keyes through Miller) cited *ante*, pp. 731-732, represents a correct view of the consideration which the trier of fact should give to relevant evidence of mental condition upon the issues of malice aforethought and intent to kill. Implications in those cases (Keyes through Miller) inconsistent with this holding are disapproved.

Defendant and amici curiae urge that in the present case statements of the trial court affirmatively show that it believed the expert testimony that defendant, because of the concurrence of mental disease and the objective circumstances with which he was confronted, in fact lacked intent to kill and malice aforethought, yet erroneously concluded that the law required it to find that those elements were present. Defendant would attribute to selected portions of the trial court's remarks[13] the force of findings of fact and conclusions of law. But those remarks when read as a whole (see *ante*, pp. 725-726) set forth reflections and reasoning pro and con, matters which tend to support the judgment and matters which tend to suggest a contrary conclusion, but all proper to be considered by the fair, impartial, conscientious, and able judge in resolving the several issues and reaching his ultimate conclusion.

In accord with the normal process of appellate review, we accept those statements which support the judgment as representing the court's final determinations, and interpret favorable to the judgment those statements which are susceptible of such interpretation. (See *People* v. *Jennings* (1959), 158 Cal.App.2d 159, 167 [6] [322 P.2d 19].) When the statements are so viewed, it is apparent that this is a case where the trial court considered all the conflicting evidence and resolved it in support of its judgment, not a case where the trial court admitted evidence but because of a misappre-

---

[13] '[I]n all probability [Dr. Diamond's] theories are correct . . . that [defendant] had no particular intent to commit this crime . . ., but I have a feeling that you are too advanced. . . . [I]t seems to me that my hands are tied with the legal jurisprudence as it stands today.'

hension of law refused to consider and weigh it upon the erroneous theory that it could not be considered. (*Cf. Smith* v. *Fetterhoff* (1956), 140 Cal.App.2d 471, 473 [1] [295 P.2d 474].)

The trial court's informally expressed opinion was that defendant's threats and actions evidenced intent to kill and malice aforethought, but that "whether he was compelled to do this because of some mental condition, that is so advanced and so far from us that we don't understand it." A fair interpretation of the quoted statement is, not that the expert testimony was as a matter of law incomprehensible or unacceptable to the court as a finder of fact or as a judge of the law, but rather that the court as a trier of fact did not have a reasonable doubt that this particular defendant, when he killed, lacked intent to kill and malice aforethought. This interpretation of the quoted statement is borne out by the trial court's further statement that "it would be a perfect first degree [murder] if it wasn't for the fact that he's never been in trouble and because of the statement of the Psychiatrist"; from this statement of the court it affirmatively appears that the implied finding of lack of deliberation and premeditation was based in part upon acceptance of the doctor's testimony.

Thus it is apparent that whatever the trial judge may have had in mind when he stated in the course of his pro and con deliberations that "I like to be advanced. But it seems to me that my hands are tied with the legal jurisprudence as it stands today," he did in truth finally decide that his fact finding hands were not tied; he must have so concluded because he received, considered and gave effect to the expert's testimony on the issues to which it was pertinent. Some of those issues he resolved in favor of the prosecution (he found the defendant guilty of murder), but others he determined in favor of the defendant (he found that the murder was *not* of the first degree). In other words, within the area of culpability for the crime charged the testimony of the expert apparrently created a reasonable doubt that the homicide was murder of the first degree but not that it was murder. The differences between the degrees of murder and between murder and voluntary manslaughter have been carefully spelled out in *People* v. *Bender* (1945), *supra*, 27 Cal.2d 164, 180-182 [13-17] (see also *People* v. *Caldwell* (1955), 43 Cal.2d 864, 869 [3-5] [279 P.2d 539]; *People* v. *Byrd* (1954), 42 Cal.2d 200, 212 [16] [266 P.2d 505]; *People* v. *Deloney* (1953), 41

Cal.2d 832, 837-839 [1-4] [264 P.2d 532] ; *People* v. *Daugherty* (1953), *supra*, 40 Cal.2d 876, 901 [26] ; *People* v. *Carmen* (1951), 36 Cal.2d 768, 777-778 [11-12] [228 P.2d 281] ; *People* v. *Cornett* (1948), 33 Cal.2d 33, 40 [3] [198 P.2d 877] ; *People* v. *Honeycutt* (1946), 29 Cal.2d 52, 60-61 [3-4] [172 P.2d 698] ; *People* v. *Valentine* (1946), *supra*, 28 Cal.2d 121, 131-132 [1-4] ; *People* v. *Thomas* (1945), 25 Cal.2d 880, 898-901 [13-17], 903 [20] [156 P.2d 7] ; *People* v. *Holt* (1944), *supra*, 25 Cal.2d 59, 84-87 [11], 90-91 [15]) and need not be reviewed here. In the light of the cited cases and the record before us, we conclude that the judgment of conviction reached by the trial court is based on a reasonable view of the evidence and a correct understanding and application of the law.

For the reasons above stated, the judgment is affirmed.

Gibson, C. J., Traynor, J., and McComb, J., concurred.

Spence, J., concurred in the judgment.