[Crim. No. 3264. Third Dist. Mar. 1, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. ELWOOD J. WILLIAMS, Defendant and Appellant.

William H. Collard, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond A. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, J.—Defendant appeals from a judgment upon a jury's verdict which found him guilty of murder in the first degree. Punishment imposed by the same jury was life imprisonment.

Defendant admitted fatally shooting his estranged wife, but contended the act was neither premeditated nor commit-

ted with malice aforethought. He asserts it was the result of an emotional stress which he had been under for a considerable period of time. He urges prejudice by certain rulings of the trial court in admitting or excluding evidence bearing on his state of mind. We have examined each contention and find no prejudicial error in the trial court's rulings. We have also studied the record and have concluded the jury was permitted fairly to receive all competent evidence offered by the defense material and relevant to the issue of the defendant's specific mental state.

The killing occurred on November 10, 1959. Defendant's wife had left him several months before, after a turbulent marriage of five years. At the time of the separation Mrs. Williams commenced a divorce action. This was followed by several efforts by defendant to reconcile, rejected by the wife. At the time of the shooting Mrs. Williams was staying with her married sister, Mrs. Goddard, and the latter's husband, in Davis. Defendant resided in San Rafael.

On the morning of November 10, 1959, defendant drove his newly-acquired sports car from San Rafael to Davis and parked it in the alley at the rear of the Goddard home. When he entered the house, his wife was alone. A conversation ensued in which defendant again sought reconciliation. His wife again refused. After about 30 minutes Mrs. Goddard returned. She found the couple talking over their marital problems. The conversation at that time was quiet and not acrimonious. Defendant appeared calm and sober. At this point, according to Mrs. Goddard, defendant asked her to go outside and look at his sports car. She did so.

She was gone only a few minutes. When she walked into the house she heard her sister, who was in the living room, cry out: ''Oh God, Swede don't.'' Then two or three shots were fired, and Mrs. Goddard, running into the room, witnessed a scene in which defendant fired altogether five or six shots, killing his wife, fired one shot, missing Mrs. Goddard as she tried to intervene, and then shot himself in the abdomen.

In addition to the evidence above there was abundant other proof of apparent deliberation, premeditation, and malice, evidencing a plan by defendant to kill his wife and then himself. Two weeks before the shooting defendant had, according to the evidence of a friend, Thomas Franks, told him of despondency over his wife's refusal to listen to his pleas for reconciliation. He said he didn't feel there was any reason for living longer but that if he killed himself ''he thought

he would take his wife with him." The same statement had been repeated two days before the event. (Defendant testified he did not recall making those statements.) The fatal gun was a nine-cartridge revolver belonging to defendant. Three weeks before November 10th he had taken it to a friend, Delmo Esposti, to keep for him. A few days before the shooting he had retrieved it. A holographic will leaving everything to his brother was made by defendant. Defendant admitted he contemplated suicide and testified he wrote his aunt in Dallas two days before the shooting, telling her of his plan. After writing this letter, he said he drove up a grade, took a shot at himself, missed, and then lost his nerve.

On November 9th defendant, from San Rafael, telephoned Mrs. Goddard at her home in Davis. The purpose of the call was evidently to learn whether his wife was in Davis. He asked Mrs. Goddard not to inform her that he had phoned. He also untruthfully stated he had no transportation because he had sold his car.

On the morning of November 10th defendant got up, as though going to work. He started to leave. He carried with him his revolver, which he had loaded with nine cartridges either that morning or the night before. He had difficulty starting his car and, stating he was late to work, he asked Mr. Sloan, with whom he lived, to help him get it started. Defendant did not appear to Sloan to be disturbed other than being late to work. He started for Davis. En route, he says, he smoked a marijuana cigarette.

Nothing in the foregoing would suggest to layman or lawyer anything other than a premeditated deliberate killing with malice aforethought. There was, however, evidence of mental instability offsetting this which will be discussed hereinafter in connection with the points raised on appeal.

Early in the trial objections were made by the district attorney to the introduction of certain evidence contended to be relevant to defendant's mental state. A recess was taken, discussion was had in the jury's absence, and defense counsel cited *People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53], and *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492], milestones in the evolution of the law of California on the perplexing question of what, if any, evidence of mental illness should be admissible on trial of the issue of the plea of not guilty, under the restrictions of Penal Code, sections 1016 and 1026.[1]

---

[1]Penal Code section 1016 provides *inter alia*: "A defendant who does not plead not guilty by reason of insanity shall be conclusively presumed

Prior to the *Wells* decision in 1949, the conclusive presumptive *of sanity* stated in the two Penal Code sections quoted in the footnote had been accepted as a similar presumption that a defendant possessed the mental capacity to have intent, malice aforethought, or other required elements of *mens rea*. (See the treatise of Bernard L. Diamond, M.D.: *Criminal Responsibility of the Mentally Ill*, 14 Stan.L.Rev. 59, at p. 74.) In *Wells* it was held the conclusive presumption of sanity could not be construed to preclude the defense from adducing otherwise competent and material evidence, including psychiatric testimony, to disprove a specific mental state. (See *People* v. *Wells, supra*, at p. 346.)

Ten years after *Wells* its rule was reiterated and amplified in *People* v. *Gorshen, supra*, where the Supreme Court (per Justice Schauer) said, on page 733: "It would seem elementary that a plea of not guilty to a charge of murder puts in issue the existence of the particular mental states which are essential elements of the two degrees of murder and of manslaughter. . . . Accordingly, it appears only fair and reasonable that defendant should be allowed to show that in fact, subjectively, he did not possess the mental state or states in issue."

The court also stated, on page 733, quoting from *People* v. *Selph*, 106 Cal.App. 704, 707 [289 P. 918]: " '[W]hile the insanity of the defendant is not in issue under the general plea, yet this does not preclude the introduction of evidence tending to establish [his] mental condition . . . at the time the offense was committed for the purpose of showing a lack of criminal intent, malice or premeditation.' "

Our review of the transcript in the instant case convinces us that the learned trial judge both understood and properly applied the rules of the *Wells* and *Gorshen* decisions.

Defendant has specified seven instances in the record where he contends he was improperly restricted in offers of evidence asserted to have relevancy to the defendant's mental state at the time of the killing. These were rulings on questions relating principally, however, to the wife's past history and characteristics, not his own; their offer in evidence was not

to have been sane at the time of the commission of the offense charged. . . . "

Penal Code section 1026 provides *inter alia*: "When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, he shall first be tried as if he had entered such other plea or pleas only, and in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed."

accompanied by any explanation of how or why such evidence would tend to prove defendant's alleged mental problems. When the court asked counsel to specify the relevancy of offered evidence, he was answered only in vague generalities; e.g., defendant, on direct examination, testified that his wife had difficulty making decisions. A repetitious question was asked and, when an objection was made, counsel asserted that this would be a factor important to subsequent medical testimony; yet when defendant's psychiatrist was put on the stand, counsel, as we shall see, did not advert to this at all.

This is typical of defendant's other specifications. Defendant offered proof regarding the deceased wife's former marriage to one Eckhart, a marriage terminating in a divorce in which custody of children of the marriage was given by stipulation to the husband. No explanation of the relevancy of this line of questioning to the defendant's state of mind was made clear. Absent such exposition, one could wonder whether the purpose was as contended or merely to divert the jury from trial of the defendant to try the victim.

Defendant complains of the sustaining of an objection to a question put to Mrs. Williams, the defendant's mother, regarding arguments between the couple witnessed by her a year before. The question was proper, but merely cumulative of ample evidence in the record of the stormy married life of the couple and again no specific materiality was pointed out. Defendant was not prejudiced. Similarly when the witness Bruce Sloan was asked what he had observed about the relationship between defendant and Mrs. Williams at the outset of the marriage, and the court asked, "Can't you tell me what you are trying to prove?" it brought the answer, "I am merely trying to get everything pertinent to his state of mind which I feel would be everything from the defendant's time of birth which would have caused nervous tension or something that would preclude particular state of mind." The court then stated: "If you can point out something that prevented this man from having a malicious intent . . . but I want to know what it is." The district attorney then objected to the last question as too general and objection was sustained.

There was no error in the court's ruling. Nor was there error in ruling out certain self-serving declarations of defendant to others.

The last specification of error made by defendant relates to the following sequence: Mrs. Goddard, the victim's

sister, was being questioned by the district attorney. She was asked about marks of violence which she had noticed on Mrs. Williams before the latter had separated from her husband, the defendant. Defendant's counsel objected without stating grounds for the objection. The objection was properly overruled since it merely called for things the witness had observed. ▆▆▆ It was followed by questions calling for hearsay as to conversations between the victim and the witness regarding the source of the bruises. (Mrs. Williams had told Mrs. Goddard she had been fighting with her husband.) This evidence was improper, *but it was not objected to,* conceivably because defendant himself had been putting on evidence of marital strife between husband and wife, including acts of violence by the former administered upon both his wife and child; this, apparently, as evidence of defendant's mental abnormality. Defendant cannot be heard to complain now of hearsay unobjected to and invited.

The trial judge here faced a difficult assignment. Fixing the extent and limitations of proof in determination of the *mens rea* has always been a perplexing problem. And now that new avenues of inquiry have been opened by *Wells* and *Gorshen* the task of the trial judge in winnowing those offers of proof legitimately relevant to the issue of mental capacity and specific intent from those designed only as diversionary tactics is exceedingly difficult and will continue to be until some distant millenium when the sciences of jurisprudence and psychiatry become in complete mesh.

Defendant's counsel was not curtailed in presenting evidence favorable to his contentions. He was allowed to prove in detail defendant's anguish because of the death of one of the couple's children following accidental burns received and his efforts to restore the marriage thereafter. Also brought out was the indifference of the wife to his advances, her taunting him by equivocal replies when he suggested, during one of their quarrels, that she might be having an affair with another man.[2] He described fully the circumstance which had touched off the shooting and which had occurred after Mrs. Goddard had left the house briefly to examine the sports car. He had told his wife that he "couldn't go on" if she would not return to him. He had again suggested the possibility of an affair between her and another man. His wife said, "Prove it." He asked for custody of the child and she said, "What can you

---

[2] Defendant had told the district attorney, however, that he did not believe that his wife was ever unfaithful.

do; what can you do?" Everything "went white" and the shooting began.

There was evidence that defendant, usually a happy person, had become very depressed after the separation. There was evidence of the efforts of others to intercede with the wife. Before the separation he had pleaded with his wife to visit a psychiatrist. Defendant related other instances of being ridiculed by his wife who told him on one occasion, "Why didn't I go to Napa," and on another occasion, "Why don't you go join Castro." His suicidal impulses were fully developed.

Defendant was permitted to, and did, put on the testimony of a psychiatrist, Dr. Malcolm Stubblebine, to state his opinion as follows: ". . . well, I think that there was at the time of the commission of this act sufficient evidence to say that he [defendant] was unable to control his behavior, that he was under chronic stress of an emotional nature which was of a severe degree and that he was unable or did not premeditate the offense for which he is on trial."

There was other psychiatric testimony by Dr. Daniel Leiberman, produced by the prosecution, expressing an opinion that at the time of the commission of the act defendant was capable of premeditating, of forming an intent, and of holding malice; but whether defendant had, or had not premeditated or intended the act he did not know and would not testify.

The jury, of course, was not required to accept the testimony of either expert. ▮▮▮▮ And yet the opinions of both the defense psychiatrist and of the prosecution were offered as if it were their principal function merely to tell the jury what its verdict should be on the issue of premeditation. Why Dr. Stubblebine was not questioned on direct examination to bring the reasons for his opinion into focus for the edification of the jury is not clear. Such questions are proper. (Code Civ. Proc., § 1872.) ▮▮▮▮ In this class of case, as in any other, the opinion of an expert is no better than the reasons upon which it is based. (*Owings* v. *Industrial Acc. Com.*, 31 Cal.2d 689, 692 [192 P.2d 1].) How else can a jury weigh the value of the opinion expressed?[3]

Dr. Stubblebine was never asked to elaborate on his reasons for the opinion expressed that defendant "was unable to"

---

[3]Contrast the incomplete testimony of the experts here with that of Dr. Diamond, the psychiatrist who testified in *People* v. *Gorshen, supra.* That testimony is liberally quoted and related at length by Justice Schauer in the court's opinion (pp. 722-725).

and "did not" premeditate the killing of his wife because of "chronic stress of an emotional nature." On direct examination the inquiry terminated with the expression of this opinion. On redirect examination or in answer to questions put by the judge this psychiatrist did refer to a "severe and chronic anxiety state" and to "some fear, some apprehension." "I think it was with him for night and day for months and years." But this must have been unconvincing to the jury when unrelated to any explanation from which the jury itself could reason and determine how such fears, anxiety and apprehensions would be sufficient to obliterate a specific intent to kill.

The judge himself conducted an extended examination of defendant's psychiatrist. In doing so he subjected himself to the criticism which inevitably faces all trial judges who conceive their function to be more than that of an umpire calling "balls and strikes." No matter how frequently it may be stated "it is the right and the duty of a judge to conduct a trial in such a manner that the truth will be established in accordance with the rules of evidence" (*People* v. *Corrigan,* 48 Cal.2d 551, 559 [310 P.2d 953]), appealing defendants, whenever a trial judge actively participates in the questioning of witnesses, will seek some basis to rely upon the equally well-established rule: "The trial judge, however, must not become an advocate for either party or under the guise of examining witnesses comment on the evidence or cast aspersions or ridicule on a witness." (*People* v. *Rigney,* 55 Cal.2d 236 [10 Cal.Rptr. 625, 359 P.2d 23], at p. 241, citing cases.)

We think that it is a close question here whether an able and experienced trial judge, in earnestly seeking the truth (under the first-quoted rule), overlapped to violate the second.

Reading and rereading the portions of the transcript where the judge took over the examination of defendant's psychiatrist, it is not easy to decide whether his questions, in addition to an attempt to supplement an incomplete coverage of the expert's reasons for his expressed opinion, were also revealing of the court's skepticism of the opinion itself and therefore constituted an adventure into advocacy.

The court preceded his question by: "Doctor, can you just describe to the Court in your own words—in words as simple and plain a layman can conceive to understand what you are saying [and] so that the Court can understand you. . . . What would you call the specific impairment of the defendant's mind that would prevent him from premeditating at the time

he [is] alleged to [have killed] his wife?'' And received the answer: ''I'd call it a severe and chronic anxiety state.'' He then asked whether the fact that defendant ''had been beating up on his wife'' would have a tendency to show malice. Upon receiving an answer that ''it would have a tendency to show he was angry, not necessarily malice,'' the court proceeded to a lengthy hypothetical question accurately reciting most of the facts indicating malice and premeditation, which have been given above, and concluded with the following:

''Now, do you still think that he could do all these things and remember all these things and describe all these things to the Jury here that he was so befuddled in his mind that he can't—that he couldn't think, that he intended to shoot his wife?'' The witness answered: ''That's right, Your Honor. I think that what you have outlined is a perfect case for my opinion, frankly.'' To this the judge replied: ''Hu huh, well do you?''

The witness was then permitted to explain his opinion. This explanation, briefly, was that defendant suffered a chronic, severe, emotional strain, with fear and apprehension to an extent that it took very little to provoke him to shoot his wife, when she taunted him with ''What can you do, what can you do.''

The judge then asked: ''Then why did he take his gun with him [when he went to see his wife]?'' and the witness answered: ''I don't know exactly.''[4]

 We have concluded that, although the question is close, the trial judge did not overstep propriety in his examination of this witness.

Moreover, if the examination, contrary to our holding, did constitute error, we do not think it can be said here that any miscarriage of justice resulted. (Cal. Const., art. VI, § 4½.) Evidence of premeditation and malice was very substantial. The defendant's opportunity to present evidence supporting his contentions was not curtailed. A very complete overall

[4]We have digested the portion of the transcript containing the court's examination of defendant's expert Dr. Stubblebine, in lieu of printing it in its entirety either in the body of the opinion or by footnote. The latter course would have involved copying 7 pages of the reporter's transcript (from line 22, p. 316 to line 2, p. 324). Mindful of rule 29 (b), Rules on Appeal, this court adopts said portions of the transcript as part of its opinion as fully and to the same effect as though set forth at length. And should defendant desire to seek a hearing in the Supreme Court this will permit him to include this portion of the transcript in the appendix to his petition as part of this court's opinion.

picture was before the jury. The jury was carefully and accurately instructed (as requested by defendant) on the rules applicable to specific intent.[5]

The judgment is affirmed.

Peek, P. J., and Schottky, J., concurred.

---

[5] "INSTRUCTION No. 11

"You are reminded that a person might be legally sane, as we define that term in dealing with the question of criminal responsibility, and yet be in an abnormal mental or nervous condition; and because of such condition he might be less likely or unable to have or to hold a specific intent or a certain state of mind, which is an essential ingredient of a certain crime. We have received evidence bearing on the mental and nervous condition of the defendant at the time of the alleged commission of the crime charged. Such evidence may be considered by you in determining whether or not, at that time, there existed in him the specific mental factor and intent which must accompany that act to constitute a certain crime or degree of crime. You do not have before you any issue as to defendant's legal sanity."

"INSTRUCTION No. 12

"The statutory conclusive presumption of sanity is only that defendant's mental condition was such that he was able to know the nature of his act and appreciate that it was wrongful and could subject him to punishment; there is no presumption that the defendant did in fact have any specific state of mind, intent or motive essential to comprise, together with the wrongful act, a particular kind or degree of crime.

"Any evidence, medical or otherwise, which bears on the question of whether or not defendant did or did not in fact possess the required specific intent or motive is pertinent to this case and should be considered by you and given such weight as you find proper under these instructions."