STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
ROBERT A. BREAKIRON, DEFENDANT-APPELLANT.

Argued January 20, 1987—Decided October 29, 1987.

*Claudia Van Wyk,* Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Carol M. Henderson,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

This case concerns the scope of the "diminished capacity" defense afforded by *N.J.S.A.* 2C:4-2. The particular question presented is whether the trial court erred in refusing to charge the jury that evidence of diminished capacity resulting from a mental disease or defect was relevant to the question of whether defendant's admitted killing of another was knowing or purposeful.

Defendant has confessed to killing a young woman with whom he lived. Following the killing, he took the victim's young child from the victim's home, stole a car and money from her parents' home, and fled to Florida. After apprehension he confessed to these acts. He was indicted for murder, kidnapping, and burglary. Defendant pled insanity as a defense to all the charges and, as to the murder, contended that because of an alleged mental disease or defect, the killing was not knowing or purposeful. At trial, he offered psychiatric testimony that

he suffered from schizophrenic tendencies; that he was hyperactive, disruptive, and physically and psychologically abused as a child; and that these conditions resulted in disorientation that made the defendant unable to formulate an intent knowingly or willfully to kill the victim. The trial court permitted the evidence to go to the jury on the issue of insanity. The trial court, however, refused to charge the jury with respect to any other relevance that the evidence might have as to the defendant's mental state. In the trial court's view, the Code of Criminal Justice had abolished the defense of diminished capacity in that no specific intent was required in order to be found guilty of murder under the Code. The jury convicted the defendant of murder, kidnapping, and burglary.

On appeal, the Appellate Division disagreed with the trial court that the Code had abolished a defense of diminished capacity in the circumstances of this case. But the majority ruled that the issue need not be submitted to a jury unless the proffer satisfied the trial court by a preponderance of the evidence that the condition had resulted in an act that was lacking in either the knowledge or the purpose required under the Code. 210 *N.J.Super.* 442, 449 (1986). Exercising original jurisdiction, the court was not persuaded that the defendant had met that standard. One judge dissented, arguing that the issue of the effect of the evidence on defendant's knowledge or purpose should have been submitted to the jury. Both majority and dissent in the Appellate Division agreed that the statute was constitutional insofar as it placed a burden on the defendant of proving the defense of diminished capacity. The majority would have required the burden to include not only proof of the presence of mental disease or defect, but also proof that the "condition negated the state of mind which is an element of the offense." *Id.* at 452. The dissent believed that "the statute shifts the burden of proof to the defendant only with respect to the question of whether he had a mental disease or defect." *Id.* at 463.

Defendant appealed as of right under *Rule* 2:2–1 and sought certification of other issues not addressed by the dissent below. We granted that petition, 105 *N.J.* 523 (1986), but limited it solely to the issue of the constitutionality of *N.J.S.A.* 2C:4–2. We now affirm in part and reverse in part.

I.

A precise understanding of the meaning of the phrase "diminished capacity" defense is necessary to the disposition of this case. To reach this understanding, we must review again the concepts of criminal responsibility set forth in the Code of Criminal Justice, *N.J.S.A.* 2C:2–1 to –12. Although the diminished capacity defense may have peripheral relevance to crimes other than murder, we shall consider it here only in the context of murder, which in itself is a form of criminal homicide under the Code.

Although we recently treated the diminished capacity defense in *State v. Ramseur*, 106 *N.J.* 123 (1987), we did not undertake there the detailed analysis necessary to deal with the recurring problems of interpretation illustrated by this case and others. *See State v. Serrano*, 213 *N.J.Super.* 419 (App.Div.1986), *certif. denied*, 107 *N.J.* 102 (1987) (trial court committed reversible error in failing to charge "diminished capacity" as an affirmative defense when testimony could justify finding that defendant suffered from a mental disease and did not have requisite state of mind); *State v. Humanik*, 199 *N.J.Super.* 283 (App. Div.), *certif. denied*, 101 *N.J.* 266 (1985) (defendant need prove existence of a mental disease or defect by only a preponderance of evidence in order to shift burden to State).

A.

Twelve centuries of debate have yet to resolve the law's attitude about the criminal mind. At common law proof of an *actus reus* and a *mens rea* sufficed to establish criminal liability. It is easier to translate the Latin than to explain the

concepts it capsulizes. In today's parlance, we describe these elements as the requirement of a voluntary act and a culpable state of mind, the minimum conditions for liability. *See N.J.S.A.* 2C:2–1 and –2. The characteristic emphasis of the common law on the conduct of the reasonable person as the measure of responsibility has dominated the debate. The concept of reasonableness gradually evolved from early notions of absolute liability (for example, forfeiture of the *deodand* [1]). *See* Robinson, "A Brief History of Distinctions in Criminal Culpability," 31 *Hastings L.J.* 815, 821 (1980). After absolute liability, "[a] distinction between what might be called 'willful' harms and 'accidental' harms [was the next distinctive notion] and was the first reflection of concern for an actor's culpable state of mind. This generally represents the broader version of the modern knowing-reckless distinction." *Id.* at 821. The remaining periods of development saw further refinements of categories of accidental harms into those that were with or without fault; accidental harms with fault were divided further into subcategories of negligence and recklessness. *Id.* at 821–22.

From these origins there developed a highly complex sub-set of mental states specifically related to the law of homicide. It seems generally agreed that these distinctions were developed for the purpose of distinguishing capital murders from others. The long history of the development of those states of mind, particularly as they applied to the law of homicide, has been well described in Wechsler & Michael, "A Rationale of the Law of Homicide: I," 37 *Colum.L.Rev.* 701 (1937).

As noted, at its earliest stages, the common law imposed liability without regard to a culpable state of mind. If someone caused harm, the person was accountable for it without any

---

[1]"The term 'deodand' derives from the Latin phrase *Deo dandum,* meaning 'a thing to be given to God,' and refers to a chattel that causes death." *State v. 1979 Pontiac Trans Am, Color Grey,* 98 *N.J.* 474, 479 (1985). Under English common law, this chattel "causing death could be forfeited to the Crown for pious purposes * * *." *Ibid.*

consideration of intent. Hogan, "Crime, Punishment and Responsibility," 24 *Vill.L.Rev.* 690 (1979). Professor Wechsler explains that the evolving

English common law rules purported to distinguish among homicides in terms of those that were murder, those that were manslaughter and those that were justifiable and excusable. The principal function of these distinctions was to differentiate criminal from non-criminal homicides, and [capital] homicides * * * from those that were not. The American law followed the same general pattern * * * [with certain] further distinctions * * *. [Wechsler & Michael, *supra,* 37 *Colum.L.Rev.* at 702 (footnotes omitted).]

In New Jersey, as elsewhere, we recognized the distinction between first and second degree murder as that which drew the line between capital and non-capital murder, the former being premeditated and deliberate or committed in the course of the commission of certain felonies, and the latter constituting all other homicides that would have been murder at common law. *State v. Ramseur, supra,* 106 *N.J.* at 387–89 (Handler, J., dissenting).

Notwithstanding such refinements, the law continued to resist inquiry into the actual subjective state of an actor's mind. This resistance stemmed, at least in part, from circumstances of procedural law. At early common law, a defendant was not permitted to present witnesses on his or her own behalf, and the defendant's own testimony was regarded as especially suspect. Robinson, *supra,* 31 *Hastings L.J.* at 845. The issue of mental state was resolved neatly by maxims. The actor was presumed to intend the natural and probable consequences of his or her own act: thus the question of *mens rea* was collapsed into the concept of *actus reus.* Not until *Sandstrom v. Montana,* 442 *U.S.* 510, 99 *S.Ct.* 2450, 61 *L.Ed.*2d 39 (1979), did the Supreme Court clarify that in a system based on the presumed innocence of the offender, to presume a guilty mental state was unconstitutional.

## B.

To resolve what Justice Jackson had described as "the variety, disparity and confusion * * * [concerning] the requisite but

elusive mental element[s of crime]," *Morissette v. United States*, 342 *U.S.* 246, 252, 72 *S.Ct.* 240, 244, 96 *L.Ed.* 288, 294 (1952), the drafters of the Model Penal Code (hereinafter MPC) unveiled what has been described as "their most significant and enduring achievement, a thoughtful definition of distinct levels of culpability." Robinson, *supra*, 31 *Hastings L.J.* at 815. They sought to reduce nearly eighty miscellaneous mental states of culpability into four basic states of culpability. *Ibid.* They recognized as a requirement of justice the proposition that, notwithstanding the deterrent value of punishing offenders without regard to fault,

> it is the distinctive feature of the penal law that it condemns offenders as wrongdoers, marshalling the formal censure of conviction and coercive sanctions on this ground. * * * *
>
> Criminal law cannot, accordingly, escape the task of recognizing and defining the essential mental elements of culpability, including the defenses that negate them; nor can it ignore mental factors in determining the gravity of different crimes. It has, of course, been urged that there should be a totally objective definition of offenses, presumably in terms of the evil actually caused or threatened by behavior, giving weight to the subjective situation only in connection with the disposition to be made of the defendant. The Institute Advisers spent much time on this submission before recommending its rejection, on the ground that it ignores the distinctive nature of the penal law both as it is and as it ought to be. [Wechsler, "Codification of Criminal Law in the United States: The Model Penal Code," 68 *Colum.L.Rev.* 1425, 1434–35 (1968) (hereinafter "Codification of Criminal Law").]

It is a view that we share: "Our system of criminal laws is predicated usually on the imposition of punishment based on the defendant's intent. Indeed, our Code's ranking of crimes by degree places those crimes committed with intentional conduct as the highest degree of crime, for which the defendant is most severely punished." *State v. Ramseur, supra,* 106 *N.J.* at 207–08.

This "[g]raded [s]pectrum of [i]ntent in [c]riminal [l]aw" was built upon four distinct levels of intent: purpose, knowledge, recklessness, and negligence. Note, "Discriminatory Purpose and Mens Rea: The Tortured Argument of Invidious Intent," 93 *Yale L.J.* 111, 121 (1983). As briefly described, a person acts purposely with respect to an element of an offense if "it is his

conscious object to engage in conduct of that nature or to cause such a result," American Law Institute, *Model Penal Code and Commentaries* (Official Draft and Revised Comments) § 2.02(2)(a)(i) (1985) (hereinafter *Model Penal Code and Commentaries*); a person acts knowingly if "he is aware that it is practically certain that his conduct will cause [the forbidden] result," *id.* § 2.02(2)(b)(ii); a person acts recklessly when he "consciously disregards a substantial and unjustifiable risk" that his conduct will cause the result the law seeks to prevent, *id.* § 2.02(2)(c); and finally, a person acts negligently when he should have been aware of a "substantial and unjustifiable risk" that his actions would cause the result that the law forbids. *Id.* § 2.02(2)(d). Although narrowing the range, these distinctions have hardly settled the debate. As Professor Wechsler noted,

> [a] layman might find it painfully ridiculous that, after a thousand years of legal development, lawyers should still be arguing about the expressions used to denote the basic ideas of our legal system.
>
> ["Codification of Criminal Law," *supra*, 68 *Colum.L.Rev.* at 1436 n. 31 (quoting Glanville Williams, *The Mental Element in Crime* 9 (1965)).]

## II.

Superimposed upon this structure of culpable mental state was the problem of dealing with the criminally insane. Diminished capacity is but one aspect of the larger problem of how the criminal justice system interacts with the mentally ill. *See* George, Jr., "The American Bar Association's Mental Health Standards: An Overview," 53 *Geo.Wash.L.Rev.* 338 (1985). At the center of the debate is the fundamental question of criminal responsibility, evidenced by the controversy surrounding the verdict that acquitted the defendant of criminal responsibility for the attempted assassination of President Ronald Reagan. See generally *United States v. Hinckley*, 529 *F.Supp.* 520 (D.D.C.1982). The acquittal fueled a debate about the very idea of mental responsibility for crime.

Notwithstanding the unresolved debate, the American Bar Association's *Mental Health Standards* continue to recommend

that a person "not [be held] responsible for criminal conduct, if at the time of such conduct, and as a result of mental disease or defect, that person was unable to appreciate the wrongfulness of such conduct." ABA, "Criminal Justice Mental Health Standards," *Standards For Criminal Justice* § 7–6.1(a) (2d ed. 1980 & Supp.1986) (hereinafter *Mental Health Standards*). That standard has been described as a rejection of the MPC's standard and a modification of the *M'Naghten* test.[2] Ellis & Luckasson, "Mentally Retarded Criminal Defendants," 53 *Geo. Wash.L.Rev.* 414, 437 (1985).

However defined and whatever the burden, this is the familiar insanity defense. It invites only three verdicts: guilty, not guilty, and not guilty by reason of insanity.[3] Diminished capac-

---

[2]The MPC standard included cognitive and volitional prongs that would not hold a person "responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law," *Model Penal Code and Commentaries, supra,* § 4.01(1); the *M'Naghten* test would be modified insofar as it excuses those who

at the time of the committing of the act, * * * w[ere] laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act [they were] doing, or, if [they] did know it, that [they] did not know what [they were] doing was wrong * * *. [*State v. Lucas,* 30 *N.J.* 37, 68 (1959).]

[3]Some commentators, however, would limit the insanity defense either to sentencing or to the *actus reus* element.

[I]ndeed * * * much of the discussion of the defense of insanity is the discussion of a myth rather than of a reality. It is no minor debating point that in fact we lack a defense of insanity as an operating tool of the criminal law other than in relation to a very few particularly heinous and heavily punished offenses. There is not an operating defense of insanity in relation to burglary or theft, or the broad sweep of index crimes generally; the plea of not guilty on the ground of insanity is rarely to be heard in city courts of first instance which handle the grist of the mill of the criminal law—though a great deal of pathology is to be seen in the parade of accused and convicted persons before these courts. As a practical matter we reserve this defense for a few sensational cases where it may be in the interest of the accused either to escape the possibility of capital punishment (though in cases where serious mental illness is present, the risk of

ity, as we shall use it here and as we believe it is used in the MPC and in our Code of Criminal Justice, does not seek to excuse the defendant from criminal responsibility. Rather, the concept refers to evidence that, in theory, affects the presence of essential mental elements of the crime.

As noted at the outset of this opinion, careful attention must be paid to the meaning of the expression "diminished capacity" defense. It has at least two meanings. We shall draw upon the words of commentators for this analysis.

> The diminished capacity doctrine allows a criminal defendant to introduce evidence of mental abnormality at trial either to negate a mental element of the crime charged, thereby exonerating the defendant of that charge, or to reduce the degree of crime for which the defendant may be convicted, even if the defendant's conduct satisfied all the formal elements of a higher offense. The first variant of diminished capacity, * * * refer[red] to as the "mens rea" variant, is the dominant approach in the United States. The second, * * * refer[red] to as the "partial responsibility" variant, is the rule in Great Britain and in indirect form has been adopted in a substantial number of American jurisdictions. [Morse, "Undiminished Confusion in Diminished Capacity," 75 *J.Crim.L. & Criminology* 1, 1 (1984) (footnote omitted).]

Another writer has referred to these two aspects of diminished capacity as the " '*mens rea*' and 'diminished responsibility' models." Arenella, "The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage," 77 *Colum.L.Rev.* 827, 828 (1977). For our purposes, we shall use the phrases "mental state" model and "partial responsibility" model, respectively, as the expressions of these two primary meanings of diminished capacity.

The California Supreme Court has given the diminished capacity doctrine its most significant articulation. California's efforts to deal with mental illness had resulted in a bifurcated procedure involving trials both of guilt and of insanity, with the

---

> execution is slight) or where the likely punishment is of a sufficient severity to make the indeterminate commitment of the accused a preferable alternative to a criminal conviction. Operationally the defense of insanity is a tribute, it seems * * *, to our hypocrisy rather than to our morality. [N. Morris, *Madness and The Criminal Law* 63–64 (1982).]

defendant "presumed sane" at the former. Evidence of insanity was admissible at a sentencing proceeding only. *People v. Troche*, 206 *Cal.* 35, 273 *P.* 767 (1928). In *People v. Wells*, 33 *Cal.*2d 330, 202 *P.*2d 53, *cert. denied*, 338 *U.S.* 836, 70 *S.Ct.* 43, 94 *L.Ed.* 510 (1949), and *People v. Danielly*, 33 *Cal.*2d 362, 202 *P.*2d 18, *cert. denied*, 337 *U.S.* 919, 69 *S.Ct.* 1162, 93 *L.Ed.* 1728 (1949), that court revisited *Troche* and held that the conclusive presumption of sanity in the *M'Naghten* sense could not preclude the introduction of evidence of mental disease if materially relevant to a defense attempting to disprove an essential element of the crime, such as malice aforethought. As the dissent explained in *Danielly*,

> the prosecution must prove intent, as well as deliberation and premeditation, to support a conviction of first degree murder. "Intent is a question of fact which may be proved like any other fact * * *." Condition of mind, insufficient to form an intent, is clearly admissible where the insanity plea is not made, and it should not be inadmissive merely because later the defendant is to have an opportunity to offer evidence of insanity to a degree that acquits him of the crime. [33 *Cal.*2d at 387, 202 *P.*2d at 33, (Edmond, J., dissenting) (citations omitted).]

The California Supreme Court later incorporated into its common law, in addition to the "mental state" model of diminished capacity, the "partial responsibility" model. *See People v. Gorshen*, 51 *Cal.*2d 716, 336 *P.*2d 492 (1959). In *Gorshen*, the trial court admitted evidence of chronic paranoiac schizophrenia and excessive drinking to prove that the defendant did not have the *specific* mental state necessary for first degree murder. 51 *Cal.*2d at 722–23, 336 *P.*2d at 495–96. The psychiatrist testified that the defendant's intent to kill was the product of the mental illness, and hence negated or diminished the defendant's free will or volitional controls. *Id.* at 723–25, 336 *P.*2d at 496. The California Supreme Court held that the trial court correctly found that the testimony created a reasonable doubt that the crime was first degree murder. *Id.* at 735–36, 336 *P.*2d at 504. Nevertheless, despite defendant's inability to form a specific intent to kill, the Court upheld a conviction for second degree murder under the "partial responsibility" model. *Ibid.* By holding the testimony competent and admissible, the

California Supreme Court "radically expanded" the subjective inquiry relevant to a defense based on a lack of *mens rea.* Arenella, *supra,* 77 *Colum.L.Rev.* at 841. The California Legislature has since all but repealed the partial responsibility defense that was articulated in *Gorshen. See Cal.Penal Code* § 28(a) (West Supp.1987).

The MPC, upon which our Code generally is based, was careful to state that its section "differs importantly from certain notions of diminished[ ] or partial[ ] *responsibility." Model Penal Code and Commentaries, supra,* at 219 (comment to § 4.02) (emphasis added).[4] It therefore disagreed with the California view that a person so afflicted who carries out a killing may lack the capacity for full reflection implicit in first degree murder, thus resulting in a verdict of manslaughter rather than murder. Because our Code, with certain important distinctions to be hereinafter noted, was premised on the MPC, we believe that the diminished capacity defense set forth in *N.J.S.A.* 2C:4–2 was intended to operate in the limited sense of being relevant to proof of any essential mental element of a crime. This is the "mental state" model.

Before turning to the specific New Jersey Code provisions, a word is in order about the structure of penal statutes in general and our Code of Criminal Justice in particular. No one chapter permits the categorization of a defense. For example, the

---

[4]Model Penal Code § 4.02 provides:

Evidence of Mental Disease or Defect Admissible When Relevant to Element of the Offense [;Mental Disease or Defect Impairing Capacity as Ground for Mitigation of Punishment in Capital Cases].

(1) Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind that is an element of the offense.

[ (2) Whenever the jury or the Court is authorized to determine or to recommend whether or not the defendant shall be sentenced to death or imprisonment upon conviction, evidence that the capacity of the defendant to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect is admissible in favor of sentence of imprisonment.]

defense of intoxication, which is similar to diminished capacity insofar as it bears upon the required mental states of the crime, is found in Chapter 2 under "General Principles of Liability." Diminished capacity, however, is found in Chapter 4 of the Code entitled "Responsibility." Defenses such as duress and entrapment, which are premised on the excuse of otherwise criminal acts, are included in the chapter entitled "General Principles of Liability." Thus, defenses based on justification, excuse, or other non-liability principles are found in differing sections of the Code.

Although most grounds for not punishing otherwise criminal acts fall into the categories of justification and excuse, there are a variety of other defenses that elude such categorization. Greenawalt, "The Perplexing Borders of Justification and Excuse," 84 *Colum.L.Rev.* 1897 (1984). In addition to justification and excuse, there are failure of proof defenses and offense modification defenses that relate to the basic elements of the offense as defined. *Id.* at 1897 n. 1 (citing Robinson, "Criminal Law Defenses: A Systematic Analysis," 82 *Colum.L.Rev.* 199, 203 (1982)). There are also the non-exculpatory public policy defenses such as statutes of limitations. These distinctions must be borne carefully in mind when we consider what the Code labels as "affirmative defenses." *N.J.S.A.* 2C:1–13c. Although described as such in the Code, they may be nothing more than failure of proof defenses.

### III.

■ It was upon the general framework described above that the New Jersey Criminal Law Revision Commission constructed the New Jersey Code of Criminal Justice. Although not precisely mirroring the MPC, our Code of Criminal Justice is basically similar to the MPC in its structure and outlook. As we have noted on prior occasions, however, between the creation of the Commission in 1969, the adoption of its report in 1971, and the adoption of the Code in 1979, much more objective

principles of criminal law evolved. *Cf. State v. Grunow,* 102 *N.J.* 133, 141 (1986) (Code incorporates objectively reasonable standards, *not* to be viewed from the actor's perspective, as to passion/provocation manslaughter and self-defense).

With respect to the substantive definitions of the crimes of murder and manslaughter, although differing in certain degrees, the Code follows the general framework of the MPC. While purposeful murder, *N.J.S.A.* 2C:11–3a(1), evidences a conscious object or design to cause death, *N.J.S.A.* 2C:2–2b(1), knowing murder, *N.J.S.A.* 2C:11–3a(2), occurs if an actor is "aware that it is practically certain that his conduct will cause such a result." *N.J.S.A.* 2C:2–2b(2). "Manslaughter," *N.J.S.A.* 2C:11–4a and b, occurs when the actor "consciously disregards a substantial and unjustifiable risk" of death, *N.J.S.A.* 2C:2–2b(3); it is aggravated manslaughter when done "under circumstances manifesting extreme indifference for human life." *N.J. S.A.* 2C:11–4a; *see State v. Ramseur, supra,* 106 *N.J.* at 270. It is the first degree crime of aggravated manslaughter if the risk is a probability as opposed to a possibility; otherwise, it is a second degree crime. *State v. Curtis,* 195 *N.J.Super.* 354, 364 (App.Div.), *certif. denied,* 99 *N.J.* 212 (1984).

The precise delineation of these four states of criminal culpability, each drawn from the Model Penal Code * * * and each defined in *N.J.S.A.* 2C:2–2(b), represented an effort, as one of the framers of the Code put it,

to achieve greater individual justice through a closer relation between guilt and culpability, requiring workable definitions of the various culpability factors. These factors must be related precisely to each element of an offense, defense, or mitigation, and all unnecessary limitations upon individual culpability should be eliminated. [Knowlton, "Comments Upon the New Jersey Penal Code," 32 *Rutgers L.Rev.* 1, 2 (1979) (footnote omitted).]

*See also N.J.S.A.* 2C:1–2(a)(4) and (6) (fundamental purpose of new Code is "[t]o give fair warning of the nature of the conduct proscribed * * * [and] [t]o define adequately the act and mental state which constitute each offense"). [*State v. Harmon,* 104 *N.J.* 189, 200–01 (1986).]

The differences in degree of moral culpability assessed by the Code are narrow but important. In the case of murder, knowledge is equated not only with awareness, but with "practical certainty," that the death will follow. Thus one who shoots the

bullet into the head of another will be hard put to convince a jury that he or she did not know, with practical certainty, that death would result. On the other hand, one who throws a punch at someone in a bar may be able to convince a jury that a death resulting from the victim's fall was not the practically certain result of the punch. The much more difficult case is one in which someone like Breakiron admits to reaching out in anger at another and choking the victim with a towel: was death his purpose? Was he practically certain the victim would die?

The Code adopts in part and rejects in part the recommendations of the MPC and the 1971 New Jersey Criminal Law Revision Commission with respect to criminal responsibility of those who are mentally diseased or deficient. As noted, the MPC had adopted an expanded principle of mental incapacity. The Commission originally recommended the repeal of the *M'Naghten* test in favor of the MPC's definition of criminal responsibility. II *Final Report of the New Jersey Criminal Law Revision Commission, The New Jersey Penal Code* 96 (1971) (commentary) [hereinafter *Revision Commission*]. It would have included the so-called "volitional" prong of the test of criminal responsibility in terms of the actor being unable to "conform his conduct to the requirements of law." I *Revision Commission, supra,* at 35. On the other hand, the Commission would have limited the diminished capacity defense of mental disease or defect to cases in which "purpose * * * is an element of the offense." *Ibid.* It would have left to the discretion of the court the resolution of the admissibility of mental disease or defect in the case of other states of mind. *Ibid.*

The Legislature somewhat reversed the priorities of the Commission. "After starting to abolish the defense of lack of criminal responsibility, the legislature took an almost unbelievable turn by enacting the M'Naghten rule." Knowlton, "Comments Upon the New Jersey Penal Code," *supra,* 32 *Rutgers L.Rev.* at 5. *N.J.S.A.* 2C:4-1 provides:

A person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong. Insanity is an affirmative defense which must be proved by a preponderance of the evidence.

At the same time, the Legislature broadened *N.J.S.A.* 2C:4-2 to provide that "[e]vidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense." It later amended the statute to include a presumption that the defendant had no mental disease or defect, and the law now provides that "[m]ental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence." *L.*1979, *c.* 178, § 11B and *L.*1981, *c.* 290, § 8. The Senate Judiciary statement that accompanies *N.J.S.A.* 2C:4-1, although stating that the Committee had decided to reinstate insanity as a defense to a criminal charge and to adopt the *M'Naghten* rule, did not articulate the Committee's intent with respect to mental disease or defect bearing on an essential element of the crime.

It is clear that the framers of the Code, who in many circumstances adapted its provisions to existing New Jersey precedent, would have wanted this provision to conform to existing law. In *State v. DiPaolo*, 34 *N.J.* 279, 297, *cert. denied*, 368 *U.S.* 880, 82, *S.Ct.* 130, 7 *L.Ed.*2d 80 (1961), the Court had held that psychiatric evidence relating to the defendant's mental capacity to act willfully and deliberately and with premeditation was admissible. The Court ruled that "[a]ctually the question is simply whether there shall be excluded evidence which merely denies the existence of facts which the State must prove to establish that the murder was in the first degree." *Id.* at 294.

In contrast with this fact-oriented inquiry, our precedent refused to admit into consideration of the defendant's guilt or innocence evidence concerning the volitional prong of mental incapacity. The Court in *State v. Sikora*, 44 *N.J.* 453 (1965), declined to accept as admissible psychiatric evidence that would

excuse the conduct of the actor as being beyond his or her control. *See also State v. Lucas*, 30 *N.J.* 37, 85 (1959) (Weintraub, C.J., concurring) (under the then current state of knowledge, concepts of psychiatry are too illusory to warrant departure from the *M'Naghten* test of criminal responsibility).

Still, we must recognize in all this an element of uncertainty. So long as psychiatrists continue to classify mental illness into disorders of *thought* and *emotion*, the legal system will employ these terms even though "[w]e know now that these distinctions are largely artificial, that the brain cannot be so neatly compartmentalized." R. Restak, *The Brain* 295 (1984). Indeed the very expression—the mind—the *mens* in *mens rea*—is now seen as an expression that only dimly conveys the reality of human consciousness. *See id.* at 343. In the long history of assessment of criminal culpability, it is juries perhaps more than jurists and doctors who have given meaning to whatever words are used. Green, "The Jury and The English Law of Homicide, 1200–1600," 74 *Mich.L.Rev.* 414 (1976).

Consequently, we believe that the diminished capacity defense was designed by the Legislature not as a justification or an excuse, nor as a matter of diminished or partial *responsibility*, but as a factor bearing on the presence or absence of an essential element of the crime as designated by the Code. The Legislature contemplated that all are not born with equal mental capacity, and it would want a jury to consider whether a mentally defective person would be as practically certain as would another that death would result from the infliction of a serious blow. This is essentially the same conclusion reached by the Third Circuit in *United States v. Pohlot*, 827 *F.*2d 889 (1987). Although the Insanity Defense Reform Act, 18 *U.S.C.* § 17, prohibits the use of evidence of mental abnormality to establish "diminished capacity" or "diminished responsibility," the Act does not prevent the defendant from introducing this evidence in order to negate *mens rea* and thus to disprove an element of the crime itself.

The way that this distinction affects a trial and jury deliberations was illustrated by *State v. Ramseur, supra,* 106 *N.J.* at 268–69, albeit in the context of a capital-murder prosecution, in which the jury was required to consider the diminished capacity defense as an aspect of the sentencing determination as well as the guilt determination. In that case there was evidence that the defendant suffered from a mental disease or defect. He contended that our Code embraced the "partial responsibility" model of the diminished capacity defense. We treated his argument thus:

> Defendant constructs an elaborate argument around his contention that "diminished capacity" is a mitigation defense. His brief argues that "the defense of diminished capacity [should] be permitted to act as a substitute *mens rea* of recklessness in cases involving murder or manslaughter"—that is, the jury should be permitted to find that "defendant was guilty of a lesser included offense of aggravated manslaughter without the required consciousness of risk the manslaughter statute's *mens rea* of recklessness requires...." In cases other than homicide, defendant urges that diminished capacity should operate to "reduce the offense to one a degree lower than the charged crime." This approach, says defendant, would "achieve[] something of the result which attends the use of the voluntary intoxication defense."
>
> Defendant's argument might have some appeal were it being made to a legislative body that was formulating a new criminal code. But we deal with our Code as it comes to us. Unlike our pre-Code law, the Code itself defines the *mens rea* requirements for all offenses. *See N.J.S.A.* 2C:2–2; II *Final Report of the New Jersey Criminal Law Revision Commission* 40 (1971). Before a defendant can be convicted of any offense, he must act with one of the states of mind set forth in *N.J.S.A.* 2C:2–2(b). There is, therefore, a state of mind for every offense save those that rest on strict liability. The "mental disease or defect" statute, *N.J.S.A.* 2C:4–2, makes admissible any relevant proof that defendant suffered from a mental disease or defect, for the purpose of demonstrating that defendant "did not have a state of mind which is an element of the offense." [*State v. Ramseur, supra,* 106 *N.J.* at 268–69.]

Thus, under the statute the mere presence of mental disease or defect does not perforce reduce murder to an unspecified degree of manslaughter. For the purpose of determining criminal guilt, diminished capacity either negates the state of mind required for a particular offense, if successful, or it does not.

In rejecting the defendant's argument that diminished capacity *"as a matter of law * * ** transforms murder into manslaughter," *State v. Ramseur, supra,* 106 *N.J.* at 270 n. 61,

we made clear, however, its relevance to the question whether *"in fact* [ ] defendant's state of mind, because of its diminished capacity, could be found to meet the requirement of manslaughter, *i.e.,* a 'conscious awareness of an unjustifiable risk.' " *Ibid.* Thus, negating the mental state for murder by producing evidence of mental disease or defect does not prohibit a conviction for manslaughter provided the essential elements of that crime are present.

### IV.

With this structure of the Code as background, we turn to the specific challenges to the application of the Code to the facts of this case.

### A.

Defendant argues that *N.J.S.A.* 2C:4–2 impermissibly shifts to him the burden of disproving an essential element of the crime by denoting the diminished capacity defense as an affirmative one that defendant must prove. He contends that since evidence of mental disease or defect is not to be received in support of a classic affirmative defense, *i.e.,* a justification or excuse for conduct that would otherwise be criminal, but instead is used to create a reasonable doubt concerning an essential element of the offense with which he was charged, the State, not the defendant, must bear the burden of proof on such an issue.

We believe that this argument flows from a continued misunderstanding of the exact components of a diminished capacity defense. We agree with the view expressed in *State v. Humanik, supra,* 199 *N.J.Super.* at 294–95, that

> the defense of diminished capacity is not designed to defeat a case the State has otherwise established. Rather, the term is a legal colloquialism referring to psychiatric or other evidence contesting the State's thesis that the accused acted with the mental state required to be proven in order to convict.

*See also United States v. Pohlot, supra,* 827 *F.*2d at 896 ("[T]he courts have used the labels diminished responsibility,

diminished capacity, and other nomenclature merely as a short-hand for the proposition that expert evidence of mental abnor-malities is admissible on the question of whether the defendant in fact possessed a particular mental state which is an element of the charged offense.... When a court rejects the doctrine of diminished capacity, it is saying that psychiatric evidence is inadmissible on the mens rea issue.").

Hence, when the Code says that mental disease or defect is an affirmative defense that must be proven by a preponder-ance of the evidence, it does not mean that the defendant must disprove that the act was knowing or purposeful. It means only what it says, that the defendant must show that he or she suffered from a mental disease or defect that is relevant to the mental state of the offense. To that extent, then, we agree with the State's position that "[i]t is not enough for defendant to simply present evidence of a mental illness or deficiency because that does not provide any basis for defense." Such a broad use of evidence of mental disease or defect would be authorized only under the "partial responsibility" model of the defense rejected by the Code. We shall discuss in Part IV B., *infra* at 614–15, the quality of evidence that a jury may consider as bearing on *mens rea* under the "mental state" model of the defense.

This interpretation of the language of *N.J.S.A.* 2C:4–2 is consistent with the Code's allocation of burdens of proof and constitutional compulsion. *N.J.S.A.* 2C:1–13a imposes on the State the obligation to prove beyond a reasonable doubt each element of an offense. Knowledge or purpose is an essential element of the crime of murder. *See N.J.S.A.* 2C:11–3a(1) and (2). The Legislature could not have intended that a mentally deficient defendant be more at a disadvantage than any other citizen.

In addition, such an interpretation bridges the differences between *Mullaney v. Wilbur*, 421 *U.S.* 684, 95 *S.Ct.* 1881, 44 *L.Ed.*2d 508 (1975), and *Patterson v. New York*, 432 *U.S.* 197,

97 *S.Ct.* 2319, 53 *L.Ed.*2d 281 (1977). In the latter case, because New York established the penalty for second degree manslaughter on the basis of mitigation premised on a finding of "extreme emotional disturbance," the Court permitted New York to impose on the defendant the burden of proving that factor. *Id.* at 205–06, 97 *S.Ct.* at 2324–25, 53 *L.Ed.*2d at 289. But in *Mullaney v. Wilbur, supra,* the Court held that under a Maine statute that defined the offense of first degree murder in terms of the absence of heat of passion, due process required the State to bear the burden on that fact. 421 *U.S.* at 704, 95 *S.Ct.* at 1892, 44 *L.Ed.*2d at 522; *cf. Martin v. Ohio,* 480 *U.S.* ——, 107 *S.Ct.* 1098, 94 *L.Ed.*2d 267 (1987) (upholding Ohio's law imposing on defendant burden of proof of self-defense since same evidence often will negate the State's case even if insufficient to prove self-defense by a preponderance of the evidence).

As we have noted, the diminished capacity defense in New Jersey is not a mitigation defense in the guilt phase of a trial. "It either provides a complete defense, if successful, or it does not." *State v. Ramseur, supra,* 106 *N.J.* at 269.[5] Since its sole function is to establish the absence of an essential element of the crime, this defense cannot have the effect of shifting the burden of proof on that essential element to the defendant. The State must prove "every fact necessary to constitute the crime." *In re Winship,* 397 *U.S.* 358, 364, 90 *S.Ct.* 1068, 1073, 25 *L.Ed.*2d 368, 375 (1970).

 The final question is whether it is impermissibly unfair to impose on the accused the obligation to prove by a preponderance of the evidence the existence of the relevant mental

---

[5]Under our capital sentencing structure, *N.J.S.A.* 2C:11–3, diminished capacity is relevant in the "partial responsibility" sense. A jury will consider such evidence, without any burden of proof on defendant, as a mitigating factor relevant to capital sentencing. In this context, evidence of mental disease or defect serves in the historic mode of aiding juries to differentiate capital murders from other murders.

disease or defect. In this respect the structure of the statute does nothing more than create an inference that the ordinary defendant is possessed of the capacity to reach the mental states required by the Code: the diminished capacity defense thus requires the defendant to establish that he or she is not such a person. *See N.J.S.A.* 2C:4–1, –2. As long as the State remains responsible to prove beyond a reasonable doubt the essential elements of an offense, the Supreme Court has held that it is constitutionally permissible to impose on a defendant the burden of proving an insanity defense that exculpates the defendant. *Leland v. Oregon,* 343 *U.S.* 790, 72 *S.Ct.* 1002, 96 *L.Ed.* 1302 (1952). *But see Rivera v. Delaware,* 351 *A.*2d 561 (Del.Supr.Ct.), *appeal dismissed,* 429 *U.S.* 877, 97 *S.Ct.* 226, 50 *L.Ed.*2d 160 (1976) (Brennan, J., dissenting) (asserting that insanity defense relates to the defendant's state of mind, an essential element of an offense, and is directly relevant to the appropriate punishment). Whether or not mental disease or defect is established, the State always bears the burden of proving beyond a reasonable doubt the essential mental elements of the crime charged. But the presence or absence of mental disease or defect is not an essential element of the crime as defined by the Legislature. *Compare State v. Federico,* 103 *N.J.* 169 (1986) (In order to sustain a conviction of kidnapping in the first degree, State must prove that defendant did not release victim unharmed and in a safe place.).[6]

Quite aside from constitutional compulsion, it would be logically impossible to charge a jury that the State must prove

---

[6]The court in *State v. Humanik,* 199 *N.J.Super.* 283, 295 (App.Div.), *certif. denied,* 101 *N.J.* 266 (1985), analogized the issue to that in *State v. Molnar,* 81 *N.J.* 475 (1980). In *Molnar* the Court concluded, with respect to the defense of amnesia in a perjury case, that there was "nothing constitutionally impermissible in requiring the accused to establish the fact of amnesia as long as the State bore the ultimate burden of proving knowledge of falsity beyond a reasonable doubt." 199 *N.J.Super.* at 296 (citation omitted). Hence, the *Molnar* court concluded that "the State need not disprove defendant's amnesia beyond a reasonable doubt and [a] request to charge the State with that burden was properly denied." *Id.* at 296–97 (citation omitted).

beyond a reasonable doubt that a defendant acted knowingly and purposefully, and then in the next paragraph charge that the defendant had the burden to disprove that fact.

We do not agree with the defendant's contention that juries will be impossibly confused by an acrobatic effort to isolate the presence of mental disease or defect from the specific culpable mental state required by the Code. The recent verdict in *State v. Ramseur, supra,* 106 *N.J.* 123, demonstrates the way in which juries receive and act on such evidence. The *Ramseur* jury, at the sentencing phase, specifically found that the defendant suffered from a mental disease or defect even though it had found him guilty of murder. In the guilt phase, however, it did not find that his mental disease or defect eliminated one of the mental states essential for the crime. While concededly there is no burden of proof on the defendant in the capital sentencing phase of a murder trial, the point remains clear that the jury was able to separate conceptually the existence of mental disease or defect, which it regarded as a mitigating factor, from the effect that such disease or defect had on the defendant's ability to form the mental state required to commit the crime of murder. This limited effect of evidence of mental disease or defect flows from the fact that

> the Model Penal Code [upon which our Code is based] does not distinguish degrees of murder, and provides no special defenses to murder based on the lesser degrees of mental impairment. Plainly, many mentally disturbed persons are capable of acting purposefully or knowingly in the minimal senses intended by the Model Code (Section 2.02), and this section provides no defense against a murder charge for one who kills with that state of mind. [*Model Penal Code and Commentaries, supra,* at 220 (comment to § 4.02).]

### B.

Our final concern is with specific application of the Code provision, *N.J.S.A.* 2C:4-2, to the facts of this case. These facts are strikingly similar to the seminal Supreme Court decision in *Sandstrom v. Montana, supra,* 442 *U.S.* 510, 99 *S.Ct.* 2450, 61 *L.Ed.*2d 39, on burdens of proof in murder cases. Here, as there, a defendant has admitted killing another person.

Aside from insanity, the only practical question is what was the degree of homicide. Was the killing done "purposely or knowingly," and therefore as a "deliberate" homicide, or was it a lesser degree of homicide? In *Sandstrom,* the Court found unconstitutional a presumption that the defendant intended the natural or probable consequences of his voluntary act and remanded the case for further consideration by the jury, under proper instructions, of the psychiatric evidence. *Id.* at 524–27, 99 *S.Ct.* at 2459–61, 61 *L.Ed.*2d at 51–53. The defendant had offered psychiatric testimony that at the time of the killing he did not have the requisite intent to cause death. *Id.* at 512–13 n. 2, 99 *S.Ct.* at 2453 n. 2, 61 *L.Ed.*2d at 44 n. 2.

The defendant here was charged with both purposeful and knowing murder. The former state of mind evidences a conscious object and desire, the latter, that the defendant be practically certain that death would result. His confession could be read to admit that he had a purpose to kill, but the psychiatric evidence sought to prove that at the time of the offense he did not knowingly or purposely kill the victim. The evidence offered to the jury was that

[a]t the time he was confused. At the time he was depersonalized. He was not committing these acts. He was standing outside watching himself, by his own accounting, by [the psychiatrists'] * * * accounting. He was depersonalized. He was so confused, his hands felt numb. He was so confused he didn't recall the towel, which color it was. He was so confused that he did not know what happened until he saw her on the floor. [The psychiatrist] d[id]n't think he actually knew, in a knowing fashion, * * * what he was doing at the time. He knew it afterwards, of course. [The psychiatrist] d[id]n't think he knew it at the time. He didn't know what he was doing. How could he know he was wrong[?]

The trial court was of the view that the defendant received the full benefit of his medical testimony by virtue of submitting the insanity defense to the jury. After correctly noting that the Code did away with the concepts of specific intent, the trial court specifically ruled:

The question is whether state of mind is an element of the crime. It is my conclusion that it is not, that the State must prove that the act was done purposely or knowingly.

A defense to that is that the defendant was insane at the time and you are entitled to that charge. I do not think that which pertains to state of mind as an element of the case.

\* \* \* \* \* \* \* \*

Knowingly or purposely must be shown by the State and the State has tried to do that. Your response can be that he was legally insane and he could not have known what he was doing or done it on purpose. \* \* \*

What I'm saying is 2[C]:4–2 is not generally available on all crimes simply because there is an allegation [that] his mental capacity was diminished or even where the proofs are advanced as [the psychiatrist's] proofs have come in. They came in on the defense of legal insanity.

But as we have seen, the insanity defense as modified in New Jersey is strictly limited to the *M'Naghten* principle of whether or not the defendant was either unable to know the nature and quality of the act he was doing (*e.g.*, that he was actually choking the victim, *Model Penal Code and Commentaries, supra*, at 166 (comment to § 4.01)) or, if he did know it, that he did not know that what he was doing was wrong.[7] In the latter sense, insanity does not serve to disprove an essential element of the crime, but instead serves to excuse totally the conduct of the actor; it is called a defense because it exculpates the defendant, even if it does not negate any element of the offense with which the defendant is charged. The diminished capacity principles are different.[8]

---

[7] In *Sandstrom v. Montana*, 442 *U.S.* 510, 512–13 n. 2, 99 *S.Ct.* 2450, 2453 n. 2, 61 *L.Ed.*2d 39, 44 n. 2 (1979), the defendant's psychiatrist admitted that defendant had the *capacity* to form the requisite intent but asserted that he did not have it at the time of the killing.

[8] The trial court's uncertainty concerning the diminished capacity defense was shared by the Legislature as reflected in its Statement to Senate No. 1537 (1980) that 2C:4–2 is consistent with the insanity defense. According to that Statement, the mental disease or defect "must be of such a nature as to preclude the actor from knowing the nature and quality of the act or that what he was doing was wrong." The State, however, does not argue that the Legislature has in fact abolished this defense. It can be argued that it would be

unthinkable that mental illness should be given a lesser reach than drunkenness. If a given mental condition (intent, recklessness) is required for the conviction of a criminal offense, then, as a proposition requiring no

As noted, the Appellate Division recognized the error in the premise of the trial court's ruling, but held that the diminished capacity charge need not be submitted to the jury unless the trial court was satisfied that the purported condition had negated the essential mental element under the Code. Because we agree with the view that diminished capacity as it exists under the Code is "evidence which merely denies the existence of facts which the State must prove to establish [the essential elements of first degree murder]," *State v. DiPaolo, supra*, 34 *N.J.* at 294, we believe that the allocation of responsibility between judge and jury requires that competent reliable evidence be submitted to the jury and that a diminished capacity charge be given to the jury when competent reliable evidence has been offered. To do otherwise would "inevitably implicate[ ] a weighing of the evidence, an exercise that intrudes into the province of the jury." *Dairy Stores, Inc. v. Sentinel Pub. Co.*, 104 *N.J.* 125, 156–57 (1986). Only in those rare cases in which, after "viewing the evidence and the legitimate inferences to be drawn therefrom in the light most favorable to defendant, * * * there is no suggestion in the evidence that defendant's faculties were so [affected] * * * as to render [defendant] incapable of purposeful or knowing conduct," should the trial court deny defendant's request. *State v. Cameron*, 104 *N.J.* 42, 57 (1986).[9] Compare *United States v. Pohlot, supra*, 827

---

discussion, in the absence of that mental condition there can be no conviction. This holds true whether the absence of that condition is attributable to blindness, deafness, drunkenness, mental illness or retardation, linguistic difficulties, or, if it could be established, hypnotic control. But this states basic principles of criminal law, not a special defense. [N. Morris, *supra* at 60.]

[9]In *State v. Cameron*, 104 *N.J.* 42 (1986), we interpreted the intoxication defense under the Code to be consistent with prior law. "Thus, when the requisite culpability for a crime is that the person act 'purposely' or 'knowingly,' evidence of voluntary intoxication is admissible to disprove that requisite mental state." *Id.* at 53. In order for intoxication to be considered relevant to negating an element of the offense, it must cause "prostration of faculties." *Id.*

*F.*2d at 905 (evidence of mental defect focused on defendant's unconscious mind, not his conscious mind; hence proper to instruct jury not to consider the evidence on *mens rea* element of the offense).

> Criminal responsibility must be judged at the level of the conscious. If a person thinks, plans and executes the plan at that level, the criminality of his act cannot be denied, wholly or partially, because, although he did not realize it, his conscious was influenced to think, to plan and to execute the plan by unconscious influences which were the product of his genes and his lifelong environment. [*Id.* at 906 (citing *State v. Sikora*, 44 *N.J.* 453 (1965)).]

■ This is not to say that the trial court need not undertake careful scrutiny of such evidence to see that it conforms closely to the narrow purpose for which it is to be admitted. For as noted by the drafters of the MPC, "many mentally disturbed persons are [quite] capable of acting purposefully or knowingly in the minimal senses intended by the Model Code." *Model Penal Code and Commentaries, supra,* at 220 (comment to § 4.02). Hence we agree with the note of caution implicit in the Appellate Division majority's disposition. We intend that the diminished capacity standard be applied carefully by courts: the only evidence of mental defect or disease that should be admitted on the defense is that relevant to the question of whether the defendant had the requisite mental state to commit the crime.[10]

---

at 54. We held that unless the evidence met that standard, the issue could not be presented to the jury. *Id.* at 54, 57.

[10]Not every mental disease or defect has relevance to the mental states prescribed by the Code. The variety and forms of mental disease are legion. They range from paranoia and schizophrenia to affective disorders and psychopathy. *See generally* Slovenko, "The Meaning of Mental Illness In Criminal Responsibility," 5 *J. Legal Med.* 1 (1984) (discussing whether various mental diseases and defects impair cognition or control sufficient to negate legal criteria for culpability). Some, such as depression or anti-social disorders, have little or no relevance to knowledge. Others, such as schizophrenia, are clearly relevant. Some states have attempted to define the relevant mental diseases or defects. *Id.* at 8. Our Code does not. But "[b]oth jurists and mental health professionals recognize that there is no perfect correlation between legal standards of 'insanity' and psychiatric classifications of mental

■ This is not the case in which to define the content of the phrase "mental disease or defect" as embraced by the Code. No party has briefed or argued so complex an issue. Suffice it to say that at a minimum the evidence must be shown to be able "to negate a mental element of the crime charged," Morse, *supra,* 75 *J.Crim.L. & Criminology* at 1, or to otherwise impair cognition. Slovenko, "The Meaning of Mental Illness In Criminal Responsibility," 5 *J. Legal Med.* 1, 16–17 (1984). In all cases the court will be alerted, prior to trial, of the defendant's intent to introduce evidence of mental disease or defect. *N.J.S. A.* 2C:4–3a; *R.* 3:12. In some cases the evidence clearly will be admissible as part of an insanity defense, in which event the court would shape its charge to the standards hereinafter described. In other cases, when insanity is not a defense, a court may wish to conduct a *Rule* 8 hearing, although we would limit the court's determination to the issue of the admissibility of proofs and not to their probative effect. We agree then with the Appellate Division majority, 210 *N.J.Super.* at 453, to the extent that a court in some cases may conduct a preliminary inquiry or hearing under *Rule* 8.

■ Defendant will not have to convince the court by a preponderance of the evidence that the condition exists or that it negates an essential element of the offense; rather, the *Rule* 8 inquiry would be limited to a preliminary showing by defendant (1) that the condition he purports to establish is relevant to his ability to have formed the requisite criminal mental state; (2) that the medical theory underlying the effect of the condition upon the relevant mental state is generally accepted within the scientific community; and (3) that the evidence defendant plans to adduce is relevant to show the existence of the condition. *See United States v. Brawner,* 471 *F.*2d 969, 1002 (D.C.Cir.1972) (outlining procedure for such a proffer). It will

disorder." Note, "A Ship of Fools: Contemporary Legal Attitudes Toward The Mentally Disordered Criminal Defendant," 52 *UMKC L.Rev.* 443, 466 (1984) (footnote omitted).

be within the sound discretion of the trial court, guided by the nature of the issues, the complexity of proofs, the progress of the trial, and the circumstances surrounding the prosecution, to determine whether defendant's burden at the *Rule* 8 hearing must be met at an evidentiary hearing or may be satisfied by a reliable proffer of evidence. We expect the former will be the exception and not the rule. Especially when there are multiple defense experts, it would be a grave burden upon a defendant to require repetition of oral testimony that was presaged in previously exchanged reports. Whether the defendant's evidence establishes the condition, and whether the condition diminished defendant's capacity to form the requisite criminal mental state, are issues that are left to the jury as part of its ultimate determination of criminal guilt or innocence. *See State v. Kelly,* 97 *N.J.* 178, 204 (1984) (testimony on battered-woman's syndrome admissible when "relevant to the reasonableness of defendant's belief that she was in imminent danger of death or serious injury"); *but see State v. Cavallo,* 88 *N.J.* 508, 526 (1982) (expert testimony on psychological traits of a rapist inadmissible since theory not generally accepted in scientific community).

## V.

To recapitulate: (1) correctly understood, the Code's defense of diminished capacity is not an affirmative defense that will justify or excuse conduct otherwise criminal, but rather allows the introduction of evidence relevant to the question of whether the State has proven beyond a reasonable doubt the requisite criminal mental state; (2) in this context it is constitutionally permissible to require the defendant to establish the presence of such mental disease or defect so long as the State retains the burden of proving the essential elements of the crime beyond a reasonable doubt; (3) except in cases where the evidence otherwise is admissible as part of an insanity defense, before evi-

dence of mental disease or defect is admitted into evidence, the trial court may determine by a *Rule* 8 inquiry or hearing that the evidence that purportedly establishes the condition is relevant to the condition and that the condition itself is relevant to the defendant's ability to form the requisite mental state; (4) the jury shall determine whether the defendant has proven by a preponderance of the evidence that the claimed mental disease or defect exists and whether the State has proven beyond a reasonable doubt that the defendant had the requisite mental state for the crime charged despite the presence of mental disease or defect; and (5) if the jury or trier of fact determines that the mental disease or defect did negate the requisite mental state for murder, conviction of manslaughter is not precluded if the evidence establishes the essential elements of that crime.

As noted, the correct way to charge the diminished capacity defense is as the trial court did in *State v. Ramseur*, 106 *N.J.* 123, 267 (1987). A defendant is entitled to have the jury charged that relevant evidence of mental disease or defect may be considered either with respect to an insanity defense or as negating the state of mind required for a particular offense, here knowing or purposeful murder. The trial court in Breakiron's case refused to give such an instruction on the murder charge.

The judgment of the Appellate Division is therefore reversed as to the murder conviction, affirmed as to the kidnapping and burglary convictions, and the matter remanded for further proceedings consistent with this opinion.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7, join in this opinion.

*Opposed*—None.