Filed 11/28/22 P. v. Hernandez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STEVEN ADRIAN HERNANDEZ,<br><br>Defendant and Appellant. | F082784<br><br>(Super. Ct. No. BF177578A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Charles R. Brehmer, Judge.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Robert C. Nash and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Steven Adrian Hernandez was involved in an altercation with two individuals, which culminated in defendant shooting a firearm several times. Defendant was charged with two counts of attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664; counts 1-2), assault with a deadly weapon (§ 245, subd. (a)(1); count 3), two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 4-5), two counts of assault by means of force likely to cause bodily injury (§ 245, subd. (a)(4); counts 6-7), unlawfully carrying a loaded firearm (§ 25850, subd. (c)(6); count 8), unlawful possession of a loaded and concealed firearm (§ 25400, subd. (c)(6); count 9), resisting arrest (§ 148, subd. (a)(1); count 10), and misdemeanor destruction of evidence (§ 135; count 11). As to counts 1 and 2, it was alleged the attempted murders were premeditated (§ 189) and that defendant intentionally and personally discharged a firearm (§ 12022.53, subd. (c)). As to counts 4 and 5, it was alleged defendant personally used a firearm during the commission of the offenses (§ 12022.5, subd. (a).)

A jury convicted defendant on counts 1, 2, 4, 5, and 8 through 11, and acquitted him on counts 3, 6 and 7. The jury found not true the premeditation allegations to counts 1 and 2, but found true the firearm enhancements to counts 1, 2, 4, and 5. On count 1, defendant was sentenced to the lower term of five years, plus 20 years for the firearm enhancement. On count 2, defendant was sentenced to a consecutive term of two years, four months, and the firearm enhancement was stricken. On counts 10 and 11, defendant was sentenced to concurrent terms in the county jail. Sentence on counts 4, 5, 8, and 9 was imposed and stayed (§ 654).

On appeal, defendant argues the evidence was insufficient to support a finding of intent to kill as required for counts 1 and 2. He also argues remand is required for the court to exercise its discretion whether to stay the sentences on counts 1 and 2, rather

---

[1] Undesignated statutory references are to the Penal Code.

than counts 4 and 5, pursuant to Assembly Bill No. 518 (2021-2022 Reg. Sess.), statutes 2021, chapter 441 (Assembly Bill No. 518). Additionally, he initially argued remand was required for the court to exercise its discretion whether to reduce the firearm enhancement on count 1 pursuant to *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*). In supplemental briefing, however, defendant contends the firearm enhancement to count 1 must instead be stricken pursuant to Senate Bill No. 81 (2021-2022 Reg. Sess.), statutes 2021, chapter 721 (Senate Bill No. 81).

We conclude substantial evidence supports the jury's finding of intent to kill on counts 1 and 2. We accept the People's concession that defendant is entitled to remand for the trial court to consider whether to stay the sentences on counts 1 and 2 pursuant to section 654. On remand the court shall consider whether to impose a lesser firearm enhancement on count 1 pursuant to *Tirado*. However, we decline to strike the firearm enhancement to count 1 in the first instance. In all other respects, we affirm.

## FACTS

### I. THE ALTERCATION

In July 2019, Jacob C.[2] owned a business renting kayaks and paddleboats at Hart Park in Bakersfield. At around 2:00 p.m. on July 27, 2019, Jacob and his friend Joshua H. were loading paddleboats into a trailer when they noticed a white sport utility vehicle (SUV) outside of a coned-off area, revving its engine. Two women, who appeared as if they had been drinking, exited the vehicle and dove into the lake. As Jacob and Joshua continued to load paddleboats, the vehicle drove through the coned-off area and struck one of the paddleboats, causing it to float out into the lake.

Jacob approached the passenger side of the vehicle and told the driver, who Jacob identified as defendant, that he had hit one of Jacob's paddleboats. Jacob noticed a

---

[2] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

partially empty bottle of tequila in the center console of the vehicle. Jacob told defendant he needed to leave and defendant responded, "Fuck you, fuck you. Let's go, let's go." Jacob understood this to mean defendant wanted to fight, and he continued to tell defendant he needed to leave. Defendant told Jacob he was Steven Hernandez from Colonia Bakers.[3] Jacob understood that to mean a fight or "something[]" bad was inevitable and he thought it best to get defendant out of the car so he could see whether defendant was armed. Jacob told defendant they could fight. Defendant stepped out of the vehicle and came around to the passenger side and swung the tequila bottle at Jacob's head. Jacob ducked and the tequila bottle flew into the lake.

Defendant bumped into Jacob and they fell to the ground, with defendant on top of Jacob. Jacob and defendant started hitting each other. While still on the ground, they moved closer toward the water and Jacob began to fear he would drown. Jacob could hear the women screaming and eventually Joshua pulled defendant off of him. Jacob and defendant stood up and Jacob asked defendant, "Are we good?" Defendant approached Jacob and Jacob hit defendant again. Jacob backed up and again asked, "Are we good?" Defendant approached him again and Jacob hit defendant again. Meanwhile, one of the women was going "crazy" and trying to hit Jacob.

Jacob and Joshua walked away and returned to loading paddleboats. Defendant and the women came back over to them. Defendant was calm but one of the women was swinging at Jacob and Jacob put his hand out to stop her. Eventually, defendant pulled the woman to the ground and told her to stop and to stay there. Defendant and Jacob

---

[3] Joshua testified that defendant identified himself as Anthony or Tony Hernandez.

The court read the jury an admonition that explained Colonia Bakers is a criminal street gang, but that defendant was not a member or associate of Colonia Bakers or involved with the gang in any way. Additionally, Detective K. McNabb testified he had determined defendant had no known membership or association with the Colonia Bakers gang. The parties also provided the jury with a stipulation that defendant was not a member or associate of any criminal street gang, including Colonia Bakers.

4.

walked across the street. Defendant told Jacob, "[W]e're good, we're good. I'm not going to swing. We're not going to fight right now. We're good." Defendant repeatedly asked Jacob to give him a fair fight and suggested they fight in the bathroom. Jacob declined and told defendant the cops were coming and it was not worth it. Defendant persisted and Jacob eventually told him to go home and sober up, and that he could return to fight Jacob at the park the next day. Defendant and Jacob shook hands and walked back across the street. Defendant told the women to calm down, but one of them said, "Fuck that, pop the trunk on his ass, fuck that." Jacob understood this to mean that defendant should go get a gun out of the vehicle.

At that point, defendant walked toward the white SUV and Jacob borrowed Joshua's phone to call 911 because he was panicking and believed defendant was going to pull a gun. However, Jacob hung up on the dispatcher out of frustration when the dispatcher asked for a description of defendant without indicating that law enforcement was on the way. When the 911 dispatcher called back, Joshua answered.[4] Jacob was behind an office, trying to keep an eye on defendant. Defendant was "fiddling around the vehicle" through the rear passenger door. Joshua told Jacob that the dispatcher asked him to get defendant's license plate number, and Jacob told Joshua not to. Nonetheless, Joshua left the office area and went across the street "some distance" from defendant. Joshua saw defendant get out of the vehicle and cock a gun, and he turned around and ran. He also yelled for Jacob to run, and Jacob immediately did so. Joshua looked back and saw defendant pointing the gun at him. He took cover behind a tree and heard two bullets "wiz" past him. Joshua estimated defendant shot approximately seven times. Not long after the shooting started, law enforcement arrived.

---

[4] A recording of Joshua's 911 call was played for the jury. A recording of Jacob's 911 call was eventually played during the defense case.

Kern County Ranger A. Agtang heard the gunshots and saw people running as she approached the lake. Several people pointed and yelled, "[H]e's in the lake, he's in the lake, he's over there, he's over there." Agtang pulled her weapon and approached the lake, where she saw defendant standing in the water. He was hunched over and his hands were not visible. Agtang held defendant at gunpoint and ordered him to put his hands up and step out of the water. Defendant yelled something back and stood there moving around in the water. Agtang continued to tell defendant to show her his hands. Eventually, defendant stepped forward and laid down in the water, with his belly and hands in the water. He was not very deep and his hands were touching the bottom of the lake. Defendant then stood up and walked slowly toward the shoreline. He did not put his hands in the air. It took several officers to take defendant into custody. In total, the encounter lasted approximately three to seven minutes.

Agtang interviewed defendant after he was placed in custody. Defendant stated he was in the river and got arrested. He did not mention anything about self-defense.

Jose P. and his family were at Hart Park on the day of the shooting. He saw a man arrive in a truck and start fighting. The man went to the truck and took out a gun and started shooting in the air. Jose P. testified that he did not see the shooter shoot at another individual. He denied telling a ranger otherwise. He did not know how many shots were fired. He denied telling a private investigator he only heard three shots. Jose P. was nervous about testifying and afraid something would happen to his family. Kern County Park Ranger C. Sotelo spoke with Jose P. after the shooting. Sotelo testified that Jose P. reported hearing seven shots fired, and he reported the shots were fired in the direction of two individuals, who Sotelo identified as Jacob and Joshua.

Jose Q. also was with his family at Hart Park on the day of the shooting. Jose Q. noticed two young women yelling at the man operating the kayak business and thought defendant was trying to calm things down. Things calmed down, then escalated again. Jose Q. heard bottles breaking. He looked over and saw two men from the kayak

6.

business running away and then heard the first gunshot. He saw defendant with his arm extended, shooting in the direction the two men were running. Defendant first shot in one direction at one of the men and then fired two shots in a different direction at the other man. He did not see defendant point the gun in the air. Jose Q. recalled hearing three gunshots in total.

## II.    FURTHER INVESTIGATION

On July 27, 2019, search and rescue team members found a .9-millimeter semiautomatic Taurus firearm in the lake at Hart Park, approximately 20 to 25 feet from the land. There was a gap between the frame and the slide of the gun, indicating the firearm malfunctioned while being fired. The gun's magazine could hold 12 rounds and there were two rounds in it when it was located. Officers found three spent shell casings and two live rounds at Hart Park, in the area of the shooting. The location of the rounds and shell casings was consistent with a shooter walking from one location to another while firing the gun.

## III.    DEFENSE CASE

Agtang was called in the defense case and testified that she conducted an interview of Jacob on the day of the shooting, approximately 30 minutes to one hour after she arrived on scene.[5] At the start of the interview, Agtang identified the case number and characterized the case as "the assault with a firearm attempted murder." This was the first opportunity Agtang gave Jacob to provide a full statement. Jacob told Agtang that defendant "barely missed some of [Jacob's] equipment and smashed into the cones." Jacob also told Agtang that, when defendant asked to fight Jacob in the bathroom, Jacob responded, "I told him I wasn't gonna get arrested it was just, it was done . . . ." Agtang acknowledged she did not ask Jacob why he would be concerned with being arrested.

---

[5] Recordings of Agtang's interviews with Jacob and Joshua were played for the jury.

Jacob also said during the interview, "[T]he whole time the guy was calling the cops." Agtang did not ask Jacob who he was referring to.

Agtang also conducted an interview of Joshua. She acknowledged that she did not specifically ask Joshua to share only details that he personally observed and heard, and did not ask Joshua if he went with Jacob to confront defendant. She did not recall any hand gestures Joshua may have made when he described holding his hands up in a defensive position against the two women.

Agtang noted that photographs of defendant taken after his arrest showed defendant had injuries on his left cheek and wrists. Through booking photographs, she identified Toni Hernandez and Adrianne Villasana as the two women at the park that day. Agtang interviewed both women prior to interviewing defendant. She testified defendant's report of the incident "was not the same as the others," inasmuch as defendant did not report being in a fight and stated only that he was swimming and then was arrested for no reason.

Defendant testified that, on the date of the incident, he had recently been paid and wanted to get out of the house with his older sister Toni and his friend Adrianne. They were hanging out at Adrianne's house and it was very hot, so they decided to go swimming in the river. They first went to pick up defendant's father, Jose, in his sister's vehicle. There was not a gun in the vehicle at that time. When they arrived, Jose was drunk. Defendant asked Jose whether he wanted to go to the river, and Jose responded that it would give him a chance to try out his "new toy," which was a gun. Defendant asked Jose to show him the gun, and Jose's female friend mouthed to defendant that he needed to take it. Jose was too drunk to stand up. Defendant realized he did not have his phone and went outside to get it. Jose followed him outside and they engaged in small talk. At some point, defendant had one sip of beer. Defendant then took the opportunity to run inside and went to Jose's toolbox to retrieve the gun. He did not know whether the gun was loaded. He put the gun in his pocket then came back out and told the girls they

8.

needed to leave. He took the beers and a partially consumed bottle of tequila that were in the house to protect his father.

Defendant stated that prior to this day, he had never fired, handled, or owned a gun and was unfamiliar with the process of obtaining a gun in California. He was familiar with the names for parts of a firearm and the functioning of a firearm from movies.

Jose saw defendant and the women loading up the alcohol in the car and defendant asked Jose whether he was going with them. Jose went into the house to get ready, and defendant folded the gun into his pants that were on the floorboard in the back seat. Ultimately, Jose did not end up going with them to the park.

Defendant drove to the river and Toni sat in the front passenger seat. Adrianne sat in the rear driver's side seat. Defendant arrived at Hart Park and parked the car. He did not see any flags or signs, only a "couple of cones" to signify the area was blocked off. Defendant acknowledged that he drove through the coned-off area but stated that he did not notice. The women jumped out of the car and went to the water. Defendant took his shirt off and stepped out of the car. He put his phone and wallet in his pants in the backseat and took one sip out of the bottle of tequila. He looked for a cup with the intent of drinking more of the tequila.

At that point, defendant was standing outside the passenger side of the car and saw Jacob approaching from approximately two parking spaces away. Defendant said, "[W]hat's up, brother?" and introduced himself as Steven Hernandez. Defendant denied telling Jacob he was in a gang. Jacob approached within an arm's reach of defendant and told defendant he could not park there and to move his car. Defendant thought, "[W]ho the hell are you to tell me?" Defendant asked Jacob why he needed to move and Jacob continued to tell him to move. Jacob spoke in a loud, authoritative voice and cussed. He told defendant to put down the bottle. Defendant continued to question why he needed to move. Jacob snatched the bottle out of defendant's hand and defendant reached for it. Jacob hit defendant with his fist and defendant punched wildly back at Jacob. Defendant

9.

was hit several times. They continued to hit each other until Joshua hit defendant twice in the back of the head and defendant fell over. Defendant collided with Jacob, knocking Jacob over with defendant on top of him. They were never close enough to the lake for defendant to hold Jacob's head under the water.

Joshua hit defendant again and Jacob ended up on top of defendant. Defendant told him to get off, and Jacob told defendant he "fucked up." Jacob seemed to lose his balance and shifted off of defendant. Defendant swept Jacob's hand out from under him. Defendant tried to get to his feet and attempted to move away from the altercation. Joshua "belly flop[ped]" onto defendant's head. The women intervened and Joshua got off defendant.

Defendant was able to get about 10 feet away from the altercation. Jacob and Joshua had a "shoving match[]" with the women and all four were yelling at each other. The women were between defendant and Jacob and Joshua. Jacob told Toni to get out of his way or he would hit her. Defendant dragged Toni away and told her to calm down, but she went back to arguing with Jacob. In order to get Jacob away from his sister, defendant suggested he and Jacob go across the street. When they were across the street, Jacob kept saying, "What's up?," which defendant understood as asking whether he wanted to fight. Jacob suggested they fight in the bathroom so the women would not have to see defendant get beat up. Defendant told Jacob he did not want to fight him and Jacob also told defendant he did not want to fight.

Jacob explained that defendant could not park in the area because the area was coned off for the boat business. Defendant asked for the name of the business and Jacob's face dropped. Defendant denied that they had a conversation about fighting the next day. He denied telling either Jacob or Joshua he was going to pop the trunk and denied saying anything about a gun or shooting them. Defendant understood the term "pop the trunk" to mean "get the gun." The women knew a gun was in the car because they were there when defendant put the gun in his pants inside the car. Toward the end

10.

of the conversation, Jacob told defendant the police were on their way. Defendant did not believe him because he did not believe Jacob would call the cops on himself. Defendant agreed to leave, but then said, "I can do whatever I want." Defendant explained that he was mocking Jacob when he said that.

Defendant returned to the car but did not recall where he had left the keys. He searched in the driver's seat for his keys and did not find them. He went to the back seat and got his clothes. He put the gun to the side and searched his pockets and the front passenger seat. He did not find the keys. Toni and Adrianne were still talking back and forth with Joshua. Toni and Adrianne made their way over to the car and Toni told him to pop the trunk to remind him there was a weapon in the car. She said, "They're lucky that [defendant] didn't get that shit," meaning the gun.

About five minutes later, Jacob again came toward defendant. Jacob looked angry and defendant expected him to start another fight. Joshua was also coming over, as well as a third man defendant had seen with Jacob and Joshua. Because there were three of them, defendant "went for the gun." Defendant began walking in their direction and the men saw the gun and began running. He did not know how to use a gun or how a gun works, beyond what he had seen in movies. He pulled the top of the gun back and shot it toward the lake. He moved away from his vehicle and tried to shoot again but the gun did not work. He "worked" the top of the gun twice and a bullet fell out each time. He then successfully fired the gun two more times. Defendant fired the last two shots to "make things final." By that point, everyone had fled.

After the second shot, defendant heard police sirens. Defendant immediately went into the lake because he did not want to have a weapon in his hand when law enforcement arrived. He was concerned he would be shot if he was still armed. He "swished" the gun around in the bottom of the lake. He was scared for his life and had trouble making out what the officers were saying to him. They demanded that he exit the lake and he eventually did. He moved slowly to minimize the risk of his being shot.

11.

Once he was out of the lake he was taken to the ground and arrested. He did not tell Agtang the truth about what happened.

Defendant denied swinging or throwing a bottle at Jacob. Defendant did not think about killing Jacob and did not think about the gun during their encounter. He did not want either Jacob or Joshua to die.

Defendant was shown photographs taken after his arrest, which showed injuries on various parts of his body. He attributed these injuries to Jacob and Joshua.

## IV.    REBUTTAL

The People called Agtang as a rebuttal witness. Agtang opined that defendant was intoxicated when she contacted him in the park. She believed Toni was "very intoxicated," and noted that Toni was unconscious in the back of the patrol car when Agtang went to speak with her. Agtang also believed Adrianne was intoxicated, and noted Adrianne smelled strongly of alcohol. Agtang acknowledged that she did not test defendant's blood alcohol concentration or conduct any other field sobriety testing.

## DISCUSSION

### I.    SUFFICIENCY OF THE EVIDENCE

Defendant contends his convictions of attempted murder on counts 1 and 2 must be reversed for insufficient evidence of his intent to kill. We conclude substantial evidence supports the convictions.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Flores* (2020) 9 Cal.5th 371, 411 (*Flores*).) Substantial evidence is evidence which is "reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) An appellate court must " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Flores*, at p. 411.) An appellate court must not reweigh the evidence

12.

(*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "If the circumstances reasonably justify the [trier of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Instead, reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

Defendant was convicted on counts 1 and 2 of attempted murder. " 'The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. [Citation.]' [Citation.] In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.] Hence, in order for defendant to be convicted of the attempted murder . . . , the prosecution had to prove he acted with specific intent to kill that victim." (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) Intent to kill can be established by showing that the assailant either desired the result, i.e., death, or knew to a substantial certainty that the result would occur. (*Ibid.*)

Here, defendant contends the evidence is insufficient to establish intent to kill because it reflects only "indiscriminate shooting" with no defined target. He does not dispute the gun was fired in the general direction of the victims, but argues such evidence is insufficient to establish his intent to kill. We disagree. The evidence established defendant instigated a prolonged fight with Jacob and, to a lesser extent, Joshua, in which he reengaged the victims multiple times. Defendant acknowledged in his testimony that he did not win the fight. Ultimately, he was encouraged by his companions to "pop the

trunk," which defendant understood as encouragement to retrieve the firearm from his vehicle. As defendant did so, the victims ran away. Defendant nevertheless walked in Jacob's direction and pointed the firearm at Jacob and later Joshua, firing at each of them. Jacob described the gun being fired "towards [him], at [him]." Joshua reported defendant aimed at him, the bullets came "really close" to hitting him, and he could hear the bullets "wiz by twice." One witness estimated Jacob and Joshua were 30 to 50 feet away when defendant began firing. Viewing this record in the light most favorable to the judgment, as we are required to do, we conclude a reasonable trier of fact could find beyond a reasonable doubt that defendant acted with intent to kill. (See *Flores*, *supra*, 9 Cal.5th at p. 411.)

Defendant relies on several cases for the proposition that discharge of a firearm is insufficient to establish intent to kill. (*Smith*, *supra*, 37 Cal.4th 733; *People v. Gorshen* (1959) 51 Cal.2d 716 (*Gorshen*), abrogated on another ground by *People v. Lasko* (2000) 23 Cal.4th 101, 110, and *People v. Blakeley* (2000) 23 Cal.4th 82, 89; *People v. Offley* (2020) 48 Cal.App.5th 588 (*Offley*).) For reasons we have explained above, the evidence is sufficient to establish that defendant had more than the intent to simply discharge a firearm, but also the intent to kill. Additionally, as explained below, the cited cases do not support defendant's argument that the evidence is insufficient to support his convictions.

*Offley* involved petitions for resentencing brought pursuant to former section 1170.95, now renumbered section 1172.6. (*Offley*, *supra*, 48 Cal.App.5th at p. 592.) Petitioner Offley had been convicted of murder, with an enhancement for the intentional discharge of a firearm resulting in death. (*Ibid.*; see § 12022.53, subd. (d).) The appellate court determined the firearm enhancement did not preclude relief under former section 1170.95, because it established only that Offley intended to discharge a firearm, and did not establish as a matter of law that Offley acted with malice aforethought. (*Offley*, at pp. 598-599.) Here, we are not tasked with determining whether the evidence

14.

establishes as a matter of law that defendant acted with intent to kill, but rather with determining whether, when viewed in the light most favorable to the judgment, the evidence would support such a conclusion beyond a reasonable doubt. (*Flores*, *supra*, 9 Cal.5th at p. 411.)

In *Gorshen*, the defendant shot and killed his foreman after a night of drinking and fighting with him. (*Gorshen*, *supra*, 51 Cal.2d at pp. 720-721.) He was convicted of second degree murder. (*Id*. at p. 719.) In evaluating the defendant's claim that "psychiatric testimony" established he did not act with malice aforethought (*id*. at pp. 719-720), our Supreme Court noted that the word "willful," as defined in section 189, "shows that the requisite intent here is not merely, e.g., to commit the act of discharging a gun, but includes the intent to kill a human being as the objective or result of such act." (*Gorshen*, at p. 730.) The court went on to hold that expert testimony regarding a mental condition bearing on the defendant's ability to form the required mens rea is relevant. (*Id*. at pp. 733-734.) This holding has no relevance to the instant case. Additionally, the high court's dicta referring to section 189 – which was not at issue in that case and is not at issue in this case – does not aid in our analysis.

Lastly, in *Smith*, the defendant was convicted of two counts of attempted murder as to his former friend or girlfriend and her baby. He shot a single bullet through the rear window of the woman's vehicle as she drove away from a heated exchange with him. (*Smith*, *supra*, 37 Cal.4th at pp. 736-738.) The defendant did not challenge his attempted murder conviction with regard to the woman, but argued only a single attempted murder conviction was possible on the facts because there was no evidence he harbored animus toward the infant. (*Id*. at p. 738.) The high court determined the evidence was sufficient to support the conviction of attempted murder of the baby in light of the events leading up to the shooting, the shooting having occurred at close range, the fact that he nearly missed both victims, and the defendant's knowledge that both victims were directly in his line of fire. (*Id*. at pp. 742-743.) The facts of *Smith* are distinguishable, most

15.

significantly in that defendant did not fire a single bullet, but rather multiple bullets, all of which were aimed at one of the two victims. As in *Smith*, the shooting was precipitated by a heated dispute, and defendant knew both victims were in his line of fire. Although there is no evidence to suggest the shooting occurred at close range, and it is unclear how close any bullets may have come to hitting the victims, the record as a whole is sufficient to support the convictions.

We therefore conclude substantial evidence supports the convictions of attempted murder.

## II.   ASSEMBLY BILL NO. 518

Prior to its amendment by Assembly Bill No. 518, section 654 provided: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, former subd. (a).) Assembly Bill No. 518 amended section 654 effective January 1, 2022, to provide, in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Thus, a trial court is no longer required to punish a defendant under the offense providing for the longest possible sentence but instead may punish a defendant under any one of the applicable offenses. The Attorney General concedes Assembly Bill No. 518 applies retroactively to defendant's case. (See *In re Estrada* (1965) 63 Cal.2d 740, 744–746; *People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

Here, the jury found defendant guilty on counts 1, 2, 4, 5, and 8 through 11. The trial court sentenced defendant on count 1 to a term of five years, plus a consecutive term of 20 years for the firearm enhancement, and on count 2 to a term of two years, four

months. The court also sentenced defendant on counts 10 and 11 to concurrent county jail terms. Sentence on the remaining counts and allegations was imposed and stayed.

Pursuant to Assembly Bill No. 518, the trial court now has discretion to punish defendant under a provision providing for a lower term of imprisonment, in lieu of the punishment on counts 1 and 2. Accordingly, we will remand for the trial court to exercise its discretion whether to do so. (See *People v. Mani*, *supra*, 74 Cal.App.5th at p. 379.)

### III. REDUCTION OF THE FIREARM ENHANCEMENT

Petitioner argues the trial court had unrecognized discretion to impose a lesser firearm enhancement on count 1. The People agree.

Section 12022.53 sets out three separate sentencing enhancements for the personal use of a firearm in the commission of certain enumerated felony offenses: subdivision (b) provides for a 10-year enhancement for the personal use of a firearm; subdivision (c) provides for a 20-year enhancement for the personal and intentional discharge of a firearm; and subdivision (d) provides for a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death. (*Tirado*, *supra*, 12 Cal.5th at p. 695.) Prior to January 1, 2018, section 12022.53, subdivision (h) prohibited trial courts from striking section 12022.53 enhancements. (*Tirado*, at p. 695.) However, Senate Bill No. 620 (2017-2018 Reg. Sess.) removed this prohibition. (*Tirado*, at p. 696; Stats. 2017, ch. 682, § 2.) "Section 12022.53[, subdivision ](h) now provides that a 'court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.' " (*Tirado*, at p. 696.) Our Supreme Court has held that the discretion to strike or dismiss an enhancement includes the discretion to impose a lesser included, uncharged enhancement. "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53[, subdivision ](d) enhancement, and the court determines that the section 12022.53[, subdivision ](d) enhancement should be struck or dismissed

under section 12022.53[, subdivision ](h), the court may, under section 12022.53[, subdivision ](j), impose an enhancement under section 12022.53[, subdivision ](b) or (c)." (*Id.* at p. 700.)

We have already determined the matter must be remanded for the trial court to exercise its discretion pursuant to Assembly Bill No. 518. On remand, the court may revisit all its prior sentencing decisions in light of all new legislation and caselaw, including its exercise of discretion pursuant to section 12022.53, subdivision (h). (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## IV.    SENATE BILL NO. 81

Defendant contends we must strike the firearm enhancement pursuant to Senate Bill No. 81. We disagree with defendant's contention that we must strike the firearm enhancement in the first instance. However, we accept the People's concession that Senate Bill No. 81 will apply to defendant's resentencing on remand.

Before Senate Bill No. 81, section 1385 permitted a trial court to strike or dismiss a sentencing enhancement, or the additional punishment for that enhancement, in the furtherance of justice. (§ 1385, subds. (a), (b).) Senate Bill No. 81 added subdivision (c) to section 1385, which provides, in relevant part: "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c).) Among the mitigating circumstances the court shall consider is whether "[t]he application of an enhancement could result in a sentence of over 20 years.

18.

In this instance, the enhancement shall be dismissed." (§ 1385, subd. (c)(2)C).) New subdivision (c)(7) of section 1385 further provides, "This subdivision shall apply to all sentencings occurring after January 1, 2022."

As defendant acknowledges, Senate Bill No. 81 applies to sentencings occurring after January 1, 2022. (§ 1385, subd. (c)(7).) Thus, by its plain language, Senate Bill No. 81 does not apply to the sentence previously imposed by the trial court. Accordingly, Senate Bill No. 81 does not provide grounds for striking the firearm enhancement previously imposed.

Nevertheless, defendant suggests dismissal of the firearm enhancement is required as a matter of law, on the ground section 1385, subdivision (c)(2)(C) requires dismissal of an enhancement that could result in a sentence exceeding 20 years. He contends that remand for the court to consider imposition of the firearm enhancement would be an "idle act," because "the only remedy the trial court could order is the same remedy this [c]ourt would order because of the plain language of section 1385, subdivision (c)([2])(C)." The People dispute that section 1385, subdivision (c)(2)(C) is mandatory, arguing instead that the decision whether to dismiss an enhancement is a discretionary determination for the trial court. In this regard, the People concede Senate Bill No. 81 will apply on remand, and the court may consider whether to strike the firearm enhancement pursuant to Senate Bill No. 81 at that time.

Defendant's challenge to the firearm enhancement under Senate Bill No. 81 is premature. On remand, the court will exercise its discretion with regard to which sentences to stay and whether to impose a lesser firearm enhancement that carries a lower term of imprisonment. It therefore is not apparent that the court's exercise of its sentencing discretion will implicate section 1385, subdivision (c)(2)(C). To the extent it does, defendant may argue the applicability of this provision on remand.

19.

## **DISPOSITION**

The matter is remanded for the trial court to exercise its sentencing discretion pursuant to Assembly Bill No. 518 and *Tirado*. In so doing, the court may revisit all its prior sentencing decisions in light of all new legislation and caselaw, including Senate Bill No. 81. In all other respects, we affirm.


DETJEN, J.

WE CONCUR:


HILL, P. J.


SNAUFFER, J.

20.